## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARJORIE SCHAEFER, an individual, and CAROLINE BERNSTEIN, an individual, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | |
| v | CLASS ACTION |
| SCI PENNSYLVANIA FUNERAL SERVICES, INC, SERVICE CORPORATION INTERNATIONAL, INC., D/B/A SHALOM MEMORIAL PARK and FOREST HILLS CEMETERY | JURY TRIAL DEMAND |
| Defendants. | |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Marjorie Schaefer and Caroline Bernstein, on behalf of themselves and all others similarly situated, by their undersigned attorneys, bring this class action lawsuit against Defendants SCI Pennsylvania Funeral Services, Inc., and Service Corporation International, Inc. d/b/a Shalom Memorial Park and Forest Hills Cemetery (together, "Defendants").

## I.    INTRODUCTION

1.    This class action seeks relief for the families who have been victimized by Defendants' fraudulent and unlawful business practices connected to their sale of burial plots, rights of interment, funeral and burial services and other death related services and products at their cemeteries.

2.    Specifically, Defendants:

1

a. Double sold burial plots at their cemeteries, depriving families' and individuals' of the ability to be interred in the particular plots they had purchased in advance of their death;

b. Represented that family members could be buried adjacent or near one another when, in fact, they could not because Defendants re-sold burial plots that were already sold years earlier; and/or

c. Sold grave spaces that were barely larger than the burial containers intended to fit into those spaces, then negligently buried containers in a way where they overlapped with adjacent spaces, resulting in Defendants discovering that they were unable to utilize previously purchased plots—because of space constraints.

3.    Defendants' actions have deprived Plaintiffs and others similarly situated of the benefit of their bargains and violated the terms of their contracts for burial plots and services by requiring Plaintiffs and their family members to accept material changes to funeral arrangements and burials, often at the last minute, requiring them to, among other things:

a. Relocate already-buried family members' remains;

b. Cram family members' remains into a smaller grave than they originally purchased; and/or

c. Agree not to bury their family members together, in violation of their family members' stated wishes, pre-need purchases, and plans.

4.    Moreover, Defendants have failed to maintain grave sites as promised. Their cemeteries are in a run-down and unkempt condition, in violation of their agreements to provide perpetual care for the graves.

5.      Gravestones are routinely toppled, run over by landscaping equipment and otherwise damaged, cracked or concealed by mud and dirt.

6.      Despite encountering these problems at cemeteries they own and operate, and despite previous settling hundreds of millions of dollars in claims premised on similar underlying issues, Defendants have failed to take the actions and precautions necessary to prevent or correct the serious problems that are the subject of this Complaint.

## II.    PARTIES

### A.  Plaintiff Marjorie Schaefer

7.      At all relevant times, Plaintiff Marjorie Schaefer ("Marjorie") was a resident of the Commonwealth of Pennsylvania.

8.      Marjorie  is the daughter of Stanley and Sandra Brenner.

9.      Stanley Brenner was a World War II veteran and the widower of Marjorie 's mother, Sandra Brenner.

10.     In 1970, Stanley and Sandra Brenner purchased two side-by-side plots within Shalom Memorial Park cemetery ("Shalom")—Lot No. 202, Section M2—so that they could be buried next to one another when they died.

11.     Stanley and Sandra paid money for their purchase of these two specific burial sites and rights of interment within Shalom.

12.     In 1973, Stanley and Sandra Brenner received the deeds to their burial plots in Shalom, Lot No. 202, Section M2.

13.     Sandra Brenner died in 2002 and was buried in the plot she and Stanley had purchased in Shalom, Lot No. 202, Section M2.

14.     Stanley Brenner died in June, 2017.

15.    During the intervening years between his wife's death and his passing, Stanley Brenner always intended and made clear to his two daughters that he desired to be buried next to his wife at Shalom.

16.    Despite the fact that he had owned the plot next to his wife since at least 1970, Defendants, without permission or notice to Stanley Brenner or his family, buried someone else in Stanley Brenner's burial plot in 1991.

17.    Defendants failed to notify Stanley or his family that Stanley could not be buried in the plot he owned.

18.    Likewise, at the time of Sandra's burial in her plot in 2002, Defendants failed to notify anyone that Stanley's plot was already partially occupied by another body, and thus Stanley would not be able to be buried adjacent to Sandra's plot as they had both planned.

19.    Instead, on the day before Stanley Brenner's funeral in 2017, Defendants notified his daughters that Stanley could not be buried next to his wife as planned because there was not enough room.

20.    Marjorie  purchased a specific casket for her father at the time of his death to match her mother's casket to fulfill Stanley's wishes that his burial arrangements be "just like Mother's."

21.    The day before his funeral, Shalom offered Marjorie three equally distasteful choices to correct its burial errors:

    a.    Either disinter and rebury Sandra Brenner twice as deep as she was originally buried, and then bury Stanley on top of her;

    b.    Choose a different plot for Stanley altogether; or

    c.    Bury Stanley in a smaller, more narrow casket and cram him into the limited available space.

22.     Prior to his death, Stanley Brenner had talked many times about the tree that would shade his and his wife's graves.  He paid extra for their plots because of the location near the tree.

23.     The burden of Shalom's error was placed upon his daughters to choose between disturbing and moving their mother's remains, **fifteen years after her death**, choosing a double burial, or cramming their father into a fraction of the grave space he had paid for.

24.     Despite having purchased a casket for Stanley that was similar to Sandra's, Marjorie  and her sister chose to bury their father without a casket container in a cramped space, in the smallest available casket, so that he could be buried next to his wife and she would not have to be relocated.

25.     Stanley Brenner's casket was so narrow that it did not fit properly on the rollers, and sat at a severe angle during his funeral service.

26.     Moreover, Stanley's casket was so small that the American flag, which was utilized at his funeral due to his status as a WWII veteran, could not be properly draped on the casket.

27.     In short, Stanley Brenner did not receive the burial plot that he paid for, and did not receive the space or burial services that he bargained for and expected from Defendants.

**B.  Plaintiff Caroline Bernstein**

28.     At all material times, Caroline Bernstein ("Caroline") was a resident of the Commonwealth of Pennsylvania.

29.     In 1983, when Caroline's mother, Irene Zubrin Gordon died, Plaintiff bought two plots in the David section of Shalom, Lot No. 771, Graves 1 and 2—one for herself and one for her mother—so they could eventually be buried next to each other.

30.     At the time of her purchase, Caroline was informed that her mother would be buried in grave number 1, on the left, and her grave would be grave number 2, on the right.

31.     Caroline paid in full for these two adjacent burial plots and rights of interment.

32.     Subsequently, Defendants sold Caroline's plot, the plot to the right of her mother, to a different family.

33.     The Defendants also sold the grave to the left of grave number 1.

34.     As a result, it is clear when viewing the grave spaces that, there is no longer room for Plaintiff to be buried on either side of her mother.

35.     Accordingly, Caroline did not receive the burial plot that she paid for from Defendants.

36.     As a result of Defendants' conduct, Caroline must alter her burial plans, or disinter and move her mother, **who has been buried for over 30 years**, so that Caroline could be buried next to her.

**C. The Defendants**

37.     Upon information and belief, Defendant SCI Pennsylvania Funeral Services, Inc. ("SCI PA") is a wholly owned subsidiary of Defendant Service Corporation International ("SCI"). SCI Pennsylvania has an address of 352 S. Gulph Road, King of Prussia, PA 19406 and owns and operates a combined forty-four (44) funeral home and cemetery operations in the Commonwealth of Pennsylvania, including Shalom Memorial Park ("Shalom") and Forest Hills Cemetery ("Forest Hills").

38.     Defendant SCI PA followed the directives of its parent, Defendant SCI, and implemented the policies alleged herein as part of a common course of conduct relating to the sale of burial plots and treatment of graves at Shalom, Forest Hills, and upon information and belief its other cemeteries.

39.    Defendant SCI is a Texas Corporation with its principal place of business located at 1929 Allen Parkway, Houston, Texas.  SCI regularly conducts business and markets its activities in Pennsylvania. Together with the other defendants, SCI owns and operates Shalom Memorial Park cemetery. SCI created the policies alleged herein and directed its subsidiaries, including SCI Pennsylvania Funeral Services, Inc., ("SCI PA"), which owns Forrest Hills Cemetery ("Forest Hills") and Shalom Memorial Park Cemetery ("Shalom"), as well as its employees and agents, to carry out these policies as part of a common course of conduct relating to the sale of burial plots and treatment of graves at Shalom as set forth fully herein.

40.    SCI is a national death care service provider and markets its services and products under the Dignity Memorial brand name ("Dignity").

41.    On SCI's website, www.sci-corp.com, SCI holds itself out as owning and managing the "Dignity Memorial" brand, provides a link to www.dignitymemorial.com, and provides a link for individuals to "find a local provider" within the "Dignity Memorial Provider Network."

42.    "Forest Hills/Shalom Memorial Park" is one of the cemeteries that is listed in the www.sci-corp.com "Provider Locator" bearing the "Dignity Memorial" brand logo.

43.    Similarly, on the Dignity Memorial website www.dignitymemorial.com, SCI holds itself out as "North America's largest provider of funeral cremation and cemetery services" with "more than 2,000 funeral, cremation and cemetery providers in the United States and Canada."

44.    Additionally, SCI represents that "the Dignity Memorial brand is your assurance of quality, value, caring service and exceptional customer satisfaction."

45.    Like the www.SCI-corp.com homepage, the www.dignitymemoral.com homepage contains a link to "Find a Dignity Memorial funeral home or cemetery provider in our network of more than 2,000 locations."

46.    Like the www.SCI-corp.com provider locator, "Forest Hills/Shalom Memorial Park" is one of the cemeteries that is listed in the www.dignitymemorial.com "Provider Locator." Here, the Forest Hills/Shalom Memorial Park also bears the Dignity Memorial brand logo.

47.    Notably, the www.dignitymemorial.com provider locator is virtually identical to the www.SCI-corp.com provider locator.

48.    Further, the "Forest Hills/Shalom Memorial Park" website is a sub-page on the www.dignitymemorial.com web domain (http://www.dignitymemorial.com/forest-hills-shalom-memorial-park/).

49.    Upon information and belief, SCI PA, Shalom, and Forest Hills websites are owned, controlled, and managed by Defendant SCI.

50.    Both www.sci-corp.com and www.dignitymemorial.com are registered to SCI and/or an SCI subsidiary, with a SCI's corporate mailing address, 1929 Allen Parkway, Houston Texas 77019.

51.    The domain registrations list Therese Lehman as the Registrant, Admin, and Tech contact for the two SCI owned domains.

52.    Therese Lehman's LinkedIn page states that she is and has been an employee of SCI since 1998.

53.    Upon information and belief, Defendant SCI manages and controls the Dignity Memorial brand and the representations made on the www.dignitymemorial.com website.

54.    Upon information and belief, Defendant SCI manages and controls the policies and procedures of SCI PA, Shalom, and Forest Hills.

55.     Upon information and belief, Defendant SCI makes key decisions regarding the operations of SCI PA, Shalom, and Forest Hills, including but not limited to the actions and conduct set forth fully herein.

56.     Upon information and belief, Defendant SCI regularly markets and/or directs its subsidiaries to market to customers of SCI PA, Shalom, and Forest Hills.

57.     Based on the Defendants' representations to the public, as set forth above, it is clear that Defendants hold themselves out to the public as one company, receive the benefit of representing the size, quality, and value of the "Dignity Memorial" brand, and do not distinguish Shalom, Forest Hills C, or SCI PA as separate and distinct entities from SCI and its brand Dignity Memorial.

58.     SCI has numerous agents and representatives as well as a wholly-owned subsidiary—SCI PA—operating in the Commonwealth of Pennsylvania.

59.     Specifically, in the Commonwealth of Pennsylvania, the SCI has a combined forty-four (44) funeral home and cemetery operations through which it conducts business and markets its funeral and burial service activities.

60.     In this regard, and at all material times, SCI owned and controlled Defendant SCI PA, and participated in, approved, and directed the unlawful acts of SCI PA described more fully herein.

61.     SCI generates significant revenue from SCI PA operations, including the operation of Shalom and Forest Hills.

62.     SCI markets and sells its Dignity brand death care services in Montgomery and Philadelphia Counties.

63.     Specifically, Defendants regularly send marketing communications as well as monthly invoices — for payments due under pre-need funeral arrangements — to customers that live in Montgomery and Philadelphia Counties.

64.     Defendants also regularly receive payments and accept payments from residents of Philadelphia and Montgomery Counties for Defendants' products and services.

65.     A portion of Shalom is located in Montgomery County.

66.     A portion of Forest Hills is located in Philadelphia County and Defendant SCI PA regularly pays taxes to the City of Philadelphia on the portion of the cemetery that is located in Philadelphia County.

67.     Accordingly, based on their physical presence in Montgomery and Philadelphia Counties and their business dealings with Montgomery and Philadelphia County residents, Defendants regularly conduct business in the Eastern District of Pennsylvania.

68.     As set forth more fully herein, SCI and SCI PA have directed, promoted, tolerated and facilitated a long-standing policy aimed at increasing profits through a pattern of improper and unlawful acts and omissions in regards to the sale of pre-burial and funeral related services that has resulted over $200 million dollars in litigation claims being paid by or on behalf of SCI − none of which have deterred the owners and officers of SCI or SCI PA − from continuing this outrageous conduct or from pursuing a "global" resolution, to ensure that this conduct does not continue to occur at Shalom or the other cemeteries owned by the Defendants.

69.     Since at least 1985, Defendants' directors, officers, and executives orchestrated the purchase of cemeteries throughout North America.

70.     Upon information and belief, in the course of their purchases, Defendants purchased the assets and assumed the obligations and liabilities of the cemeteries without

10

conducting due diligence into: the cemeteries' records, state of cemeteries' existing burials, and/or the pre-sold obligations of the cemeteries.

71.    Subsequent to the purchases, without adequately cataloging the existing burials, records, and obligations of the acquired cemeteries, Defendants directed and implemented policies and procedures for Shalom—as well as their other cemeteries—that were designed to maximize profits at the expense of properly administrating Defendants' death care services business.

72.    As a result, Defendants either ignored or directed the unlawful activity described herein and/or were engaged in a practice of "willful blindness" to the outrageous behavior set forth below.

73.    After reasonable investigation, Plaintiffs aver that each of the Defendants acted as an agent, instrumentality and alter ego of the other with a unity of purpose designed to increase profits at the expense of Plaintiffs through the promotion of their outrageous conduct such that each Defendant is jointly and severally liable for the acts of the others based upon the long-standing unlawful practices described herein.

## III.    JURISDICTION AND VENUE

74.    This Court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from Defendants.

75.    This Court has personal jurisdiction over Defendants because Defendants continually and systematically transact business within the Commonwealth of Pennsylvania and because Defendant SCI PA maintains its principal place of business in this state.

76.     Venue is proper in the Eastern District of Pennsylvania because a substantial part of the events or omissions giving rise to the claim occurred in this District. Defendant SCI PA has its principal place of business in this District, it is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District, does substantial business in this District, and is subject to personal jurisdiction in this District.

## IV.     FACTS

77.     Defendants have a long history of similar unlawful conduct in the burial services industry dating back over a decade.[1]

78.     Defendants were fully aware that their conduct was unlawful and was harming its customers and their families, yet the Defendants continued to affirmatively engage in such conduct because it financially benefitted SCI and its subsidiaries.

79.     Defendants were motivated to conceal their knowledge of the unlawful practices complained of herein as Defendants were aware its business model would suffer if such disclosures were made.

80.     Despite Defendants' knowledge of multiple serious problems with its burial practices and record keeping, the Defendants intentionally omitted any disclosures to their potential or existing customers regarding these substantial problems, and also failed to implement any policy that would correct these problems and/or prevent similar problems from occurring in the future.

---

[1] *See Joan Light v. SCI Funeral Services,* No. 01-21376 CA-08, Broward County, Florida ( $65 million settlement in 2008 related alleging SCI and its affiliates engaged in deceptive practices with respect to the sale of burial plots and rights of interment at cemeteries it owned and controlled.); *Sands v. SCI*, No. BC421528, filed in Los Angeles Superior Court ($80 million settlement in 2010 alleging among other things that for over 25 years, SCI and its affiliated entities routinely damaged and broke protective burial vaults containing remains buried at the cemetery in order to make room for new graves and generate additional profits).

81.    Upon information and belief, Defendants made, and continue to make, a conscious business decision not to conduct cemetery-wide investigations at cemeteries—where issues have occurred in the past—to determine the true state of their burial records and existing burials.

82.    Upon information and belief, Defendants made, and continue to make, a conscious business decision not to inform purchasers of pre-sold graves that there may be issues with their pre-made burial arrangements.

83.    Defendants' officers are clearly aware of the global issues throughout Defendants' cemeteries, but have failed to take any meaningful action.

84.    Defendant SCI's CEO, Thomas Ryan has been with the company since 1996 and has served as an executive since 2000. Ryan was on notice of the burial practices and cemetery issues referenced herein.

85.    Moreover, SCI's Chairman, Robert Waltrip, is the founder of SCI and has been involved with the company since the 1960s. Waltrip was on notice of the burial practices and cemetery issues reference herein.

86.    Despite the officers and board presiding over multiple settlements totaling in excess of $200 million for improper burial practices, Defendants have done nothing prevent such practices from occurring at SCI PA.

87.    The board members and officers of Defendants have been aware of improper burial practices and the absence of any policy to correct such unlawful practices at its acquired cemeteries, including SCI PA's cemeteries, for decades.

88.    Moreover, upon information and belief, Defendant SCI creates and enforces the policies and procedures of its subsidiaries, including SCI PA and is therefore liable for the subsidiaries' conduct and the harm resulting therefrom.

89.     Further, upon information and belief, Defendant SCI's employees and agents conduct due diligence prior to purchasing cemeteries through their subsidiaries, like SCI PA, and make the decision whether to purchase a cemetery.  Accordingly, SCI is also liable for failure to conduct proper due diligence on a cemetery prior to purchasing it, even if the cemetery is owned by a subsidiary.

**Shalom Memorial Park and Forest Hills Cemetery**

90.     Defendants have been aware of issues, problems and complaints similar to SCI's nationwide issues at cemeteries owned by SCI PA, namely Forest Hills and Shalom.

91.     As set forth above, upon information and belief, the issues described herein resulted from SCI's cemetery purchasing and burial product sales policies.

92.     In July of 2014, the Philadelphia Daily News highlighted prior occasions where SCI's conduct caused trauma for a bereaved family.

93.     The article entitled "No peace for some at Shalom Memorial Park" highlighted the following example:  In 2010, a family who had previously purchased a burial plot for their mother adjacent to the spot where their father was buried was informed ***on the day of the funeral*** that the grave sites were too close together and that their mother would not fit in the grave that she had purchased.

94.     Defendants either "oversold" the plots within Shalom, pursuing an intentional or reckless, willful and/or knowing policy of selling more burial plots than the amount of land available for burial, failed to take any steps to remedy pre-existing double sold graves, knowing that this type of issue has previously plagued their cemeteries, and/or negligently buried other containers in such a way that caused them to overlap with other burial plots.

95.    Upon information and belief, Defendants made an intentional decision to ignore whether, and/or how many bodies are buried in spots that appear empty, but may have been previously sold throughout Shalom and/or Forest Hills.

96.    Further, upon information and belief, Defendants have continued to sell pre-need grave spaces at Shalom and Forest Hills without verifying whether those spaces are occupied, despite their knowledge that the records kept by Defendants and/or the previous owners of the cemetery do not accurately reflect the true location of bodies within the cemeteries.

97.    The Philadelphia Daily News covered a similar example of Defendants' willful blindness to the state of their cemeteries on April 9, 2017 in an article titled "When Someone Else is Buried in Mother's Grave."

98.    There the son of his deceased mother was notified *on the morning of his mother's funeral* that she could not be buried next to her pre-deceased husband because someone's unidentified remains were buried in his mother's pre-purchased plot.

99.    Importantly, Defendants had to obtain a court order in order to disinter the unidentified body in order for the individual's parents to be buried together.  As a result, the individual's mother remained unburied for over a month.

100.    Upon information and belief, Defendants' uncovering of bodies on the eve of a burial is a direct result of their decision not to perform a cemetery-wide inventory of existing burial and an audit of their burial records, despite readily available technology that would enable them to do so with minimal to no intrusion on existing graves.

101.    Additionally, Defendants have not implemented any procedures for pre-need owners of side-by-side graves to ensure that family members can be buried together in adjacent graves without undue delay or having to exhume and relocate a previously buried individual.

102.    Instead, Defendants continue to perform new burials in areas that are saturated with existing graves, with the inevitable and foreseeable result that new graves encroach on existing graves, violate the boundaries of plots that have already been sold, and lead to the discovery of unidentified corpses in pre-purchased grave-plots.

103.    Further, after being put on notice of multiple similar complaints, Defendants have failed to take any remedial action at the cemeteries they acquire, namely Shalom and/or Forest Hills, to prevent such situations from occurring in the future.

104.    Defendants failed to timely probe graves when sold, failed to maintain maps and records of burials and failed to properly bury bodies to ensure that future burials will fit in pre-purchased grave spaces.

105.    In addition to their own individual experiences and those listed above, the Plaintiffs are aware and therefore aver the following additional examples of misconduct by SCI and its affiliates, including but not limited to SCI PA, at their Pennsylvania-based cemeteries:

    a. Insufficient room between two existing graves preventing the ability to bury a loved one next to their spouse or relative, despite existing pre-need arrangements;

    b. Grave markings indicating that someone may be purchased in an individual's pre-need grave space;

    c. Pre-purchased adjacent plots can no longer be adjacent because of encroaching or double burials;

    d. Gravestones and memorial benches being placed over a spot owned by another individual, indicating that the space is occupied or may no longer be large enough to fit a burial container;

    e. Pre-purchased but unused plots being moved to a different location within the cemetery without notice or consent.

106.    As is reflected by the foregoing facts and allegations, Defendants have engaged in a companywide pattern of unlawful activity in the death care services industry which has been

promoted or tolerated by the Defendants since as early as 1985. The unlawful practices included, but were not limited to the following all of which occurred prior to this lawsuit:

   a.   Defendants purporting to grant exclusive burial space to families and promising not to encroach on that private burial space, all the while knowing that the Defendants intended to violate these agreements in order to enrich the Defendants at the expense of its clients;

   b.   Defendants buried individuals in the wrong grave spaces and/or on top of existing coffins;

   c.   Defendants failed to keep accurate records regarding particular grave plots;

   d.   Defendants failed to have an individual's purchased grave plot available upon the individual's death;

   e.   Defendants buried individuals in a manner which encroached on previously granted grave plots;

   f.   Defendants knowingly sold grave plots without sufficient space and/or margin for burial error as part of a pattern of Defendants' conduct in attempting to squeeze more bodies into existing space in order to generate more profits;

   g.   Defendants failed to provide reasonable perpetual care for the maintenance of grave sites within Shalom and Forest Hills.

107.    Despite Defendants' actual knowledge of this outrageous pattern and practice of routinely violating contracts for burial service and the sale of burial plots, Defendants failed to disclose these issues to Plaintiffs as purchasers of its pre-death services, misled the families and buyers, and recklessly failed to implement any policy or practice which would eliminate this outrageous conduct so as to avoid continuing harm to their burial service clients.

108.    In order to continue their efforts to sell grave plots, funeral services, burial services, burial merchandise, and otherwise to generate more profits from its death care services, Defendants failed to disclose their true intentions in that they failed to have any policy in place to

accurately keep burial records and conduct proper burials to avoid encroaching on grave plots which they had sold to the Plaintiffs and others similarly situated.

109. Moreover, despite their actual knowledge of faulty and inaccurate burial records, Defendants recklessly and/or knowingly failed to pursue a cemetery-wide solution to known issues.

110. In the case of Shalom Memorial Park, Defendants have not taken the steps necessary to prevent the harm suffered by the Plaintiffs and others.

111. Defendants have not taken steps to verify in advance of need, *i.e.* the death of a contract holder, whether or not that contract holder can in fact utilize the burial plot he or she paid for.

112. The burden and delay related to fixing Defendants' errors and misconduct is then placed on the contract holder's survivors. These issues typically occur on or shortly before the day on which the "at need" deceased individual is due to be buried, and the Defendants wait until the last moment to notify the next of kin of their inability to bury the decedent as promised and contracted for.

113. Upon information and belief, the Defendants know that such issues inevitably will arise, but refuse to provide a global remedy to prevent such occurrences in the future.

114. Upon information and belief, the Defendants continue to sell burial plots with knowledge or with reckless disregard for the truth of the representations made with respect to the contracts for the burial plots being sold to the consuming public.

115. Plaintiffs in this case have been harmed by Defendants' unlawful conduct and seek relief from the Defendants for their failure to correct their practice and pattern of engaging

in fraudulent sales of grave plots under circumstances which mislead the purchasers, and for

Defendants failure to disclose their known problems and burial improprieties.

## CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) and

(b)(3) on behalf of themselves and on behalf of all other similarly situated individuals and seeks

to represent the following class (and subclasses):

> The National Class:  All persons who entered into agreements for
> burial plots, interment rights, and/or burial services at Defendants'
> Cemeteries, or were authorized to oversee the burial of loved ones
> at Defendants' Cemeteries and Defendants did not have the pre-
> purchased plot and/or the appropriate plot size available.

> The Pennsylvania Sub-Class: All Pennsylvania citizens who entered
> into agreements for burial plots, interment rights, and/or burial
> services at Defendants' Cemeteries, or were authorized to oversee
> the burial of loved ones at Defendants' Cemeteries and Defendants
> did not have the pre-purchased plot and/or the appropriate plot size
> available.

117.    Excluded from the Class are Defendants, their assigns, successors, legal

representatives, and any entities in which Defendants have a controlling interest.

118.    Plaintiffs reserve the right to revise these class definitions and to add additional

subclasses as appropriate based on facts learned as the litigation progresses.

119.    **Numerosity**: The Class is sufficiently numerous and dispersed across the United

States so that joinder of all members is impracticable.  While the exact numbers and identities of

Class Members are unknown at this time, being in the sole possession of Defendants and being

attainable by Plaintiffs only through discovery, Plaintiffs believe the proposed classes consist of

thousands, if not more, of individuals.

120.    **Commonality**: Common questions of law and fact exist for each cause of action

and predominate over questions involving individual Members of the Class. These common issues include, but are not limited to, whether:

a.  Defendants routinely oversold burial plots at Defendants' Cemeteries;

b.  Defendants' policies and procedures included granting exclusive burial space to families, promising not to encroach on that private burial space;

c.  Whether Defendants intended to violate these agreements in order to maximize profits, thereby enriching the Defendants at the expense of its clients;

d.  Defendants buried individuals in the wrong grave spaces and/or on top of existing coffins;

e.  Defendants failed to keep accurate records regarding particular grave plots;

f.  Defendants routinely failed to have pre-purchased burial plots available upon the death of the plot purchaser;

g.  Defendants buried individuals in a manner which encroached on previously granted grave plots;

h.  Defendants knowingly sold and used grave plots without sufficient space and/or margin of error as part of a pattern of Defendants' conduct in attempting to cram more bodies into existing space in order to generate more profits;

i.  Defendants recklessly and/or knowingly failed to pursue a cemetery-wide remedy, after being put on notice of similar incidents, to prevent future similar incidents and similar harm from occurring;

j.  Defendants failed to provide reasonable perpetual care for the maintenance of grave sites within Defendants' Cemeteries;

k.  Defendants violated the consumer protection statutes and other laws applicable to

the Pennsylvania subclass;

l.    Defendants are being unjustly enriched by their fraudulent, morally repugnant

business and burial practices as outlined herein;

m.    Plaintiffs and the Class have been and continue to be damaged by Defendants'

alleged misconduct and, if so, the proper measure of their damages; and

n.    Defendants engaged in practices that warrant equitable and injunctive relief and/or

punitive damages.

121.    **Typicality**: Plaintiffs' claims are typical of the claims of all Members of the proposed Class because, among other things, Plaintiffs and all Class Members were damaged by the same wrongful conduct of Defendants as alleged herein.  The relief sought is common to the proposed Class.

122.    **Adequacy of Representation**: Plaintiffs will fairly and adequately protect the interests of the proposed Class, and Plaintiffs' interests do not conflict with the interests of other members of the proposed Class who they seek to represent. Plaintiffs have retained counsel competent and experienced in class actions, consumer protection law, and other complex litigation.

123.    **Predominance and Superiority**: The above questions of law are common to the Members of the Class and predominate over any questions affecting only individual members.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual litigation by of all members of the Class is impracticable because the cost of litigation would be prohibitively expensive for each Class Member and would impose an immense burden upon the courts.  Plaintiffs and the Class are not likely to be able to vindicate and enforce their rights unless this action is maintained as a class action.

124.    **Prevention of Inconsistent Results**: Individualized litigation by Class Members

would also present the potential for inconsistent or contradictory judgments and rulings. By contrast, proceeding as a class action would present fewer management difficulties, conserve the resources of the parties and of the court system, and is the only means to protect the rights of all Class Members.

125.    Defendants have acted and will act on grounds generally applicable to the Class as a whole, and Plaintiffs seek, inter alia, equitable remedies including final injunctive relief with respect to the Class as a whole.

126.    Plaintiffs' counsel, who are highly experienced in class actions, do not anticipate any particular difficulty in managing this case as a class action.

## COUNT I
## NEGLIGENCE
### (On behalf of the National Class, or Alternatively, the Pennsylvania Subclass)

127.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

128.    By contracting with Plaintiffs and Plaintiffs' loved ones, and accepting the care, custody and control over the remains of the individuals interred within Defendants' Cemeteries, Defendants assumed a duty of care to Plaintiffs and the Class. Defendants' duties included, among other things:

      a.  To maintain accurate burial records and maps for the plots sold and burials effected within Defendants' Cemeteries;

      b.  Not to sell burial plots that had were already sold;

      c.  Not to sell burial plots with insufficient space to conduct a burial utilizing standard sized caskets and burial containers;

      d.  Not to inter human remains in the wrong burial plots;

e.  Not to relocate human remains without authorization from the decedents' loved ones;

f.  To handle human remains with reasonable dignity and respect;

g.  To employ policies and procedures for burials that avoid encroachment on private burial space when digging adjacent graves;

h.  To avoid the routine damaging of pre-existing markers and gravestones when digging adjacent graves;

i.  To properly supervise and train employees on the preparation of burial sites in a manner so as to avoid harm to nearby burial plots, graves and markers;

j.  To ensure that pre-purchased burial plots are available upon the death of the plot purchasers;

k.  To inspect Defendants' Cemeteries and the records associated with the cemeteries, investigate the problems outlined herein and take actions to correct the problems;

l.  To provide reasonable perpetual care for the maintenance of all graves within Defendants' Cemeteries;

m.  To inform the purchasers of pre-purchased burial plots of known issues with the cemetery and with the sections in which the pre-purchased plots were located; and

n.  To otherwise use reasonable care in the operation of Defendants' Cemeteries.

129.    Moreover, Courts have routinely recognized that entities in the funeral services industry, like Defendants, "bear a special responsibility to treat those aggrieved with truthfulness, accountability, and compassion. ***Taking advantage of those in mourning, is a violation of that sacred trust, and is simply reprehensible.***"  *See Baynes v. George E. Mason Funeral Home, Inc.*, No. 3:09-CV-153, 2011 WL 2181469, at *1 (W.D. Pa. June 2, 2011) (emphasis added).

130.     The Pennsylvania Supreme Court found that a duty exists "where there exists a special relationship where it is foreseeable that a breach of the relevant duty would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress." *Toney v. Chester Cty. Hosp.*, 614 Pa. 100, 36 A.3d 83 (2011).

131.     Among other relationships that give rise to a duty, the Court specifically noted that a duty arose as a result of "***the relationship between the loved ones of the deceased and those responsible for caring for the corpse.***" *Id.*, at 112-13 (emphasis added).

132.     Aside from a contractual duty, Defendants also have a special relationship with Plaintiffs and the Class members who are the next-of-kin to the individuals that purchased pre-need grave spaces from Defendants, and therefore owe a duty to those individuals to conduct pre-need arrangements in accordance with the plans and wishes of the decedents.

133.     Defendants breached their duties to Plaintiffs and the Class as set forth herein, and failed to act with reasonable care in operating Defendants' Cemeteries.

134.     Defendants' breaches of their duties include, but are not limited to:

   a.   Overselling burial plots;

   b.   Failing to maintain accurate burial records and maps of the cemeteries;

   c.   Failing to maintain sufficient space between burial plots and graves to permit new graves to be excavated and prepared without damaging existing, nearby plots and graves;

   d.   Burying human remains in the wrong plots;

   e.   Relocating plots and/or human remains without proper notification and authorization;

   f.   Failing to handle human remains, caskets and burial containers with reasonable

dignity and respect;

g.  Recklessly and/or knowingly failing to pursue a cemetery-wide remedy, after being put on notice of similar incidents, to prevent future similar incidents and similar harm from occurring; and

h.  Failing to provide reasonable perpetual care for the maintenance of all graves within Defendants' Cemeteries.

135.    Defendants' breaches of their duties to Plaintiffs and the Class were intentional, careless and/or reckless.

136.    As a direct, proximate and foreseeable result of Defendants' breaches of their duties, Plaintiffs and the Class suffered economic and non-economic damages.

137.    Defendants knew or should have known that their intentional, careless and/or reckless actions would cause damages to Plaintiffs and the Class.

## COUNT II
## BREACH OF CONTRACT
**(On behalf of the National Class, or Alternatively, the Pennsylvania Subclass)**

138.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein at length.

139.    Plaintiffs and the Class each entered into substantially similar agreements Defendants for burial plots, rights of interment and other funeral and burial services and products.

140.    With respect to these agreements, Plaintiffs paid money in exchange for specific burial plots within Defendants' Cemeteries that Plaintiffs chose, as well as rights of interment within those specific plots.

141.    The rights of interment in the specific plots chosen by Plaintiffs were material to

Plaintiffs' decisions to contract for burial services at Defendants' Cemeteries.

142.    Plaintiffs' contracts for burial plots and services within Defendants' Cemeteries expressly and/or impliedly included the following material terms:

   a.  Plaintiffs would have exclusive rights and access to the specific burial plots purchased upon their deaths or the deaths of their loved ones for whom the plots were purchased;

   b.  No other remains would be buried in the plots purchased by Plaintiffs;

   c.  Plaintiffs' burial plots would not be sold to another;

   d.  Defendants would take appropriate measures and keep records of burials to ensure that the grave sites sold were utilized by the proper individuals, plots were not oversold, and human remains were not buried in the wrong locations;

   e.  Defendants would take appropriate measures to space burial plots sufficiently and excavate with proper care so as to avoid damaging nearby burial plots or existing graves while preparing / excavating for burials; and

   f.  Defendants would provide perpetual care for grave sites within Defendants' Cemeteries, maintaining graves and markers in a reasonable fashion.

143.    To the extent Plaintiffs contracted with Defendants' predecessors in ownership of Defendants' Cemeteries, the above referenced express and implied terms transferred to Defendants upon their purchase of the cemeteries.

144.    Plaintiffs satisfied all of their obligations pursuant to their contracts for burial services and rights of interment at Defendants' Cemeteries, including payment of the purchase prices.

145.    Defendants materially breached their contracts with Plaintiffs by:

26

a. Overselling burial plots;

b. Failing to maintain accurate burial records and maps of the cemeteries;

c. Failing to maintain sufficient space between burial plots and graves to permit new graves to be excavated and prepared without damaging existing, nearby plots and graves;

d. Burying human remains in the wrong plots;

e. Relocating plots and/or human remains without proper notification and authorization;

f. Failing to handle human remains, caskets and burial containers with reasonable dignity and respect;

g. Failing to inform the purchasers of pre-purchased burial plots of known issues with the cemetery and with the sections in which the pre-purchased plots were located;

h. Failing to pursue a cemetery-wide remedy, after being put on notice of similar incidents, to prevent future similar incidents and similar harm from occurring; and

i. Failing to provide reasonable perpetual care for the maintenance of all graves within Defendants' Cemeteries.

146.    As a result of Defendants' breaches as set forth herein, Plaintiffs suffered both economic and non-economic damages.

## COUNT III
## BREACH OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES ACT
### (On behalf of the National Class, or Alternatively, the Pennsylvania Subclass)

147.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

148.     This Count is brought on behalf of the National Class and Pennsylvania Subclass.

149.     This claim arises under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), section 201-2(4)(i)(v),(vii), (ix), (xiv) and (xxi) of the UTPCPL, 73 Pa.C.S.A. §§ 201-1, *et seq*.

150.     "The purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices." Keller v. Volkswagen of Am., Inc., 733 A.2d 642, 646 (Pa. Super. 1999).

151.     It is well-established that, in order to carry out that purpose, the UTPCPL must be liberally construed. *See Chiles v. Ameriquest Mortg. Co.*, 551 F.Supp.2d 393, 398 (E.D. Pa. 2008) ("The UTPCPL must be construed liberally."); *Pirozzi v. Penske Olds-Cadillac-GMC, Inc.,* 413 Pa. Super. 308, 605 A.2d 373, 376, *appeal denied*, 532 Pa. 665, 616 A.2d 985 (1992) ("our supreme court held that the UTPCPL is to be liberally construed in order to effect its purpose.")

152.     In order to prevail under the UTPCPL, a plaintiff must prove the transaction between plaintiff and defendant constituted "trade or commerce" within the meaning of the UTPCPL and that the defendant was engaged in unfair or deceptive acts or practices.

153.     The conduct alleged herein clearly took place during "trade and commerce" within the meaning of the UTPCPL in that Defendants are selling burial products and burial services to the public.

154.     Privity is not required under the UTPCPL as "specially foreseeable beneficiaries may pursue claims under the UTPCPL.

155.     The Superior Court has recently held that a merchant "may be sued for fraud in absence of strict privity when the third party 'was specifically intended' to rely upon the

fraudulent conduct or when the reasonable reliance of a third party on the fraudulent conduct was 'specially foreseeable'…." *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.,* 393 Pa. Super. 339, 349, 574 A.2d 641, 646 (1990) *aff'd,* 529 Pa. 512, 605 A.2d 798 (1992); *see also Adams v. Hellings Builders, Inc.*, 146 A.3d 795 (Pa. Super. 2016) ("Technical privity is no longer required to assert a cause of action for fraud or a violation of the [UTPCPL.  Instead, the focus is on whether reliance on alleged misrepresentations was specially foreseeable [and] courts have specifically determined that a third-party purchaser of property is specially foreseeable.")

156.    The UTPCPL applies to the claims of Plaintiffs and the other members of the Class because the conduct which constitutes violations of the UTPCPL by Defendants occurred in substantial part within the Commonwealth of Pennsylvania.

157.    Plaintiffs and other members of the Class are consumers who purchased burial plots and related services primarily for personal or family purposes within the meaning of 73 Pa.C.S.A. § 201-9.2.

158.    Plaintiffs, although not in direct privity with Defendants, as the family and next of kin of the purchasers of the burial plots and related services and the beneficiaries of the products and services provided by Defendants, were specially foreseeable Plaintiffs and their reliance on Defendants' representations was specially foreseeable.

159.    Defendants used and employed unfair methods of competition and/or unfair or deceptive acts or practices within the meaning of 73 Pa.C.S.A. §§ 201-2 and 201-3.

160.    The UTPCPL 73 P.S. § 201-2(4)(xxi) defines unfair or deceptive acts or practices, *inter alia*, as any: "deceptive conduct which creates a likelihood of confusion or misunderstanding."

161.    As alleged more fully above, Defendants have engaged in deceptive conduct which creates a likelihood of confusion or misunderstanding.

162.    The practices of Defendants as alleged herein are clearly deceptive and, indeed, are outrageous and shocking.

163.    Defendants' concealments, omissions, deceptions and conduct were likely to deceive and likely to cause misunderstanding and/or in fact caused Plaintiffs and the other members of the Pennsylvania Subclass to be deceived.

164.    Defendants intended that Plaintiffs and the other members of the Pennsylvania Subclass would rely on its misrepresentations, concealment, warranties, deceptions and/or omissions.

165.    Plaintiffs and the other members of the Pennsylvania Subclass have been damaged as a proximate result of Defendants' violations of the UTPCPL and have suffered actual, ascertainable losses.

166.    As a direct and proximate result of Defendants' violations of the UTPCPL as set forth above, Plaintiffs and the other members of the Pennsylvania Subclass have suffered an ascertainable loss of money and are therefore entitled to relief, including damages, plus triple damages, costs and attorney's fees under Section 201-9.2 of the UTPCPL.

167.    To the extent that justifiable reliance is required to be plead, Plaintiffs have justifiably relied on the Defendants' conduct and omissions.

168.    The Plaintiffs reasonably and justifiably expected that Defendants would not engage in the activities outlined above.

169.    Defendants' conduct as set forth above, was intentional, knowing, purposeful, willful, wonton and/or reckless, justifying treble and/or punitive damages.

170.    As a proximate result of Defendants' conduct, Plaintiffs have suffered an ascertainable loss of money, property and severe emotional distress.

171.    Defendant's actions were outrageous in that they were committed wrongfully, knowingly, oppressively, intentionally, with an evil motive, actual malice, wanton and reckless disregard for the law, gross negligence, and/or reckless indifference to the rights of Plaintiffs. Therefore, Plaintiffs are entitled to recover treble damages under the UTPCPL.

### COUNT IV
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (On Behalf of the National Class or, Alternatively, the Pennsylvania Subclass)

172.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

173.    This Count is brought on behalf of the National Class and Pennsylvania Subclass.

174.    All contracts in Pennsylvania contain an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

175.    Defendants breached the covenant of good faith and fair dealing by, *inter alia*, overselling burial plots; failing to maintain accurate burial records and maps of Shalom Memorial and Forest Hills; failing to maintain sufficient space between burial plots and graves to permit new graves to be excavated and prepared without damaging existing, nearby plots and graves; burying human remains in the wrong plots; relocating plots and/or human remains without proper notification and authorization; failing to handle human remains, caskets and burial containers with reasonable dignity and respect; and failing to provide reasonable perpetual care for the maintenance of all graves within Shalom Memorial and Forest Hills.

176.    Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs

31

and the Class Members material benefits of their bargains originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the other Class Members, respectfully request that the Court:

A) Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an Order certifying one or more Classes as defined above;

B) Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C) Award all actual, general, special, incidental, statutory, punitive and consequential damages and restitution to which Plaintiffs and the Class Members are entitled;

D) Award pre- and post-judgment interest on such monetary relief;

E) Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order requiring Defendants to inventory all available and pre-sold grave spaces, to ensure that individuals can be buried in their pre-purchased grave spaces and to notify individuals who may not fit, so that they may seek remedies while they are still living and have an opportunity to make a decision as to the disposition of their remains.

F) Award Treble Damages pursuant to the UTPCPL;

G) Award reasonable attorneys' fees and costs pursuant to the UTPCPL; and

H) Grant such further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  November 3, 2017.

McCune Wright Arevalo LLP

BY: _____

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
555 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 200-0580
Email: jgs@mccunewright.com

BOCHETTO & LENTZ, P.C.

By: _____

Bryan R. Lentz, Esquire
Anton Kaminsky, Esquire
1524 Locus Street
Philadelphia, PA 19102
Telephone: (215) 735-3900

*Attorneys for Plaintiffs and Putative Class*

33