# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROLINE BERNSTEIN, an individual, MARLA UROFSKY on behalf of RHEA SCHWARTZ, an individual, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>SERVICE CORPORATION INTERNATIONAL and SCI PENNSYLVANIA FUNERAL SERVICES,<br><br>    Defendants. | Civil Action<br><br>No. 17-4960 |

**McHUGH, J.**                         **DECEMBER 6, 2018**

## <u>MEMORANDUM</u>

This is a putative class action involving burial services and the alleged failure of Defendants to inter family members next to each other. Plaintiffs Caroline Bernstein and Marla Schwartz—on behalf of her mother Rhea Schwartz—bring several claims, on behalf of themselves and the class, against Defendants Service Corporation International (SCI) and SCI Pennsylvania Funeral Services (SCI PA). Specifically, Plaintiffs allege that Defendants: (1) were negligent in carrying out burial services, breaching a duty owed to those with interment rights in specific burial plots they had purchased as well as to their next of kin, (2) breached contractual promises of exclusive interment rights in burial plots, (3) induced Plaintiffs into purchasing the burial plots through deceptive promises that they and their loved ones would be buried side-by-side, in violation of the Unfair Trade Practices and Consumer Protection Law (UTPCPL), and (4) breached the duty of good faith and fair dealing. Defendants now move to

1

strike Plaintiffs' class allegations and to dismiss Counts I, III, and IV of Plaintiff's First Amended Class Action Complaint—the negligence, UTPCPL, and duty of good faith and fair dealing claims, respectively. After considering the parties' submissions and supplemental briefing, I will deny the Motion to Strike and will grant the Motion to Dismiss with respect to Counts I and IV but deny it as to Count III.

## I.  Pertinent Facts

Defendant SCI Pennsylvania Funeral Services, Inc. is part of a network of funeral services providers wholly owned by Defendant Services Corporation International. SCI began with a small group of funeral homes but today holds itself out as "North America's largest provider of funeral and cemetery services, with shares traded on the New York Stock Exchange." Services Corporation International Official Website, *Our Business/History*, www.sci-corp.com (last visited Nov. 16, 2018). Despite its size, SCI identifies its employees as "mothers, fathers, sisters, brothers, sons, and daughters who are devoted to the communities where we live and work" and who "provide caring assistance to families in need." Services Corporation International Official Website, *Home*, www.sci-corp.com (last visited Nov. 16, 2018). With the purpose of "assist[ing] families with compassion and guidance at difficult times, helping them celebrate the significance of lives that have been lived . . . with dignity and honor," SCI markets a subset of its services and products through the brand name "Dignity Memorial." Services Corporation International Official Website, *About SCI*, www.sci-corp.com (last visited Nov. 16, 2018); Services Corporation International Official Website, *About SCI: Our Brands*, www.sci-corp.com (last visited Nov. 16, 2018). The Dignity Memorial website includes, in its list of funeral homes and cemeteries, Shalom Memorial Park and Roosevelt Memorial Park where Plaintiffs purchased burial plots. *See* Dignity Memorial, *Find Funeral Homes or Cemeteries*, www.dignitymemorial.com (last visited Nov. 16, 2018).

In 1983 and 1975, Plaintiffs Caroline Bernstein and Rhea Schwartz purchased burial plots in Shalom Memorial Park and Roosevelt Memorial Park, respectively. In 1983, Caroline purchased two plots in the David section of Shalom Memorial Park—Graves 1 and 2—after her mother died. At the time of purchase, Shalom informed Caroline that her mother would be buried in Grave 1 and that Grave 2—immediately to the right of Grave 1—would be reserved for Caroline to eventually be buried alongside her mother. Caroline alleges, however, that Defendants have since sold Grave 2 to another family. Caroline claims that Defendants also sold the grave to the left of Grave 1, so she can no longer be buried next to her mother. As a result, Caroline must either alter her burial plans, or disinter and move her late mother from Grave 1, the resting place she has occupied for over thirty years.

Rhea Schwartz faced a similarly difficult choice at Roosevelt Memorial Park. Rhea and her late husband Jack purchased three burial plots in Lot N5-118 of Roosevelt Memorial Park—Graves 1, 2, and 3—when their son, Marc, passed away in 1975. At that time, Jack and Rhea believed that Marc was buried in Grave 3 and that they would be buried in Graves 1 and 2, respectively. When Jack died in 2011, he was buried in Grave 1, as planned, leaving Grave 2 for Rhea to eventually occupy. But in 2015, while visiting the graves of Jack and Marc, Rhea and her daughter Marla noticed what appeared to be an extra space between the graves. Concerned that this meant a stranger would be buried on one side of her, Rhea contacted Roosevelt. In response, she received a letter that read: "Please be assured that you will eventually be buried between and next to your husband on one side and next to your son on the other side. No stranger will separate your family." Pl.'s Am. Compl. Ex. A. Yet in the late summer of 2017, Rhea and Marla discovered that a stranger had in fact been buried in between Marc and Grave 2, Rhea's intended plot.

It appears that Marc had been buried in Grave 4, as opposed to Grave 3, and a stranger now occupied Grave 3—Marc's intended grave. In a letter dated September 28, 2017, the cemetery admitted that Marc was not in the proper grave alongside his parents' plots and sought authorization to disinter and reinter his body to allow for his burial in Grave 3. Pl.'s Am. Compl. Ex. C. In October 2017, Rhea signed a form authorizing Marc's disinterment and re-interment, but she specifically struck from the form provisions that would indemnify and hold harmless the cemetery and its affiliates for losses or liability in connection with misrepresentations, negligence, or other misconduct related to the interment. Pl.'s Am. Compl. Ex. D. Thus, Marc, who by then had been buried over 40 years, was disinterred and moved so that his mother, Rhea, could be buried alongside her late husband and son, as promised in the original agreement. Presumably, the individual in Grave 3 was likewise disinterred and re-interred elsewhere.

The parties' submissions indicate that these were not the first instances in which Defendants encountered such problems. Despite Defendants' contentions that the risk of double-selling plots or burying individuals in the wrong plots "is remote" and would be "bad business," Defs.' Suppl. Br. 7, the allegations of SCI engaging in such behavior appear to be anything but remote. In the First Amended Complaint, Plaintiffs cite an article from 2014 that refers to dozens of allegations of oversold plots at Shalom Memorial Park. Pl.'s Am. Compl. 14; William Bender, *No peace for some at Shalom Memorial Park*, PHILADELPHIA DAILY NEWS, July 14, 2014. Another article that Plaintiffs reference from 2017 includes additional allegations of SCI overselling plots at Shalom Memorial Park and other cemeteries. Pl.'s Am. Compl. 15; William Bender, *When someone else is buried in Mother's grave*, PHILADELPHIA DAILY NEWS (April 7, 2017), http://www2.philly.com/philly/news/cemetery-sci-double-burials-shalom-philadelphia.html. Both parties further recognize that this is not the first time Defendants have

4

faced litigation related to problems with double-sold plots or burial in incorrect plots. Plaintiffs note multiple cases in which defendants have settled similar claims, Pl.'s Am. Compl. 12, and Defendants themselves cite a lawsuit brought against them on remarkably similar facts. Defs.' Suppl. Br. 17-18. These prior allegations gave Plaintiffs reason to believe they may not be the only customers of SCI to have experienced the alleged problems.

On these facts, Caroline Bernstein and Marla Schwartz, acting on behalf of her mother Rhea, bring this action on behalf of themselves and others similarly affected by Defendants' practices, both in Pennsylvania and nationally. Their complaint signals an intention to certify two classes under Rule 23(b)(2) and (b)(3), but they have yet to formally move for certification. The plaintiffs propose the following classes:

> The National Class: All persons who entered into agreements for burial plots, interment rights, and/or burial services at Defendants' Cemeteries, or were authorized to oversee the burial of loved ones at Defendants' Cemeteries and for which Defendants did not have the pre-purchased plot and/or the appropriate plot size available.
>
> The Pennsylvania Sub-Class: All Pennsylvania citizens who entered into agreements for burial plots, interment rights, and/or burial services at Defendants' Pennsylvania Cemeteries, or were authorized to oversee the burial of loved ones at Defendants' Pennsylvania Cemeteries and for which Defendants did not have the pre-purchased plot and/or the appropriate plot size available.

On behalf of themselves and the proposed classes, Plaintiffs allege that SCI and SCI PA breached the terms of their agreements and breached the implied covenant of good faith and fair dealing (Counts II and IV, respectively). Separately, they also contend that Defendants' conduct constitutes negligence and represents deceptive business practices in violation of the UTPCPL (Counts I and III, respectively). Defendants now move to strike Plaintiffs' class allegations under Rule 12(f) and to dismiss all but Plaintiffs' breach of contract claim under Rule 12(b)(6). I consider each in turn.

5

## II. Controlling Standard

Federal Rule of Civil Procedure 12(f), as amplified by *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181, 188 (3d Cir. 1986), governs the Motion to Strike Class Allegations. Federal Rule of Civil Procedure 12(b)(6), as augmented by *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009), provides the standard for the Motion to Dismiss.

## III. Discussion

### a. *Motion to Strike*

Defendants urge me to strike Plaintiffs' class allegations, insisting that they cannot possibly meet the requirements of Federal Rule of Civil Procedure 23. I decline.

Courts may, in rare instances, strike class allegations prior to a motion for class certification. Rule 12(f) permits courts to strike any "redundant, immaterial, impertinent, or scandalous matter" from a pleading, and Rule 23(c)(1) requires courts to determine "[a]t an early practicable time" whether a proposed class satisfies class certification requirements. Under these rules, however, "a plaintiff may generally conduct discovery relevant to the Rule 23 class certification requirements," and courts should "only grant a motion to strike class allegations if class treatment is evidently inappropriate from the face of the complaint." *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 615 (E.D. Pa. 2015). As such, motions to strike are disfavored and considered "a drastic remedy to be resorted to only when required for the purposes of justice." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (citation omitted). Defendants argue that this is the rare case in which the Court should strike class allegations prior to a motion for class certification.

Defendants first contend that Plaintiffs' proposed classes are not properly ascertainable because they constitute "fail-safe" classes, where membership depends on a liability

determination. Because the Third Circuit has not yet adopted the concept of fail-safe classes, *Zarichny*, 80 F. Supp. 3d at 624, I begin with the established ascertainability analysis. Ascertainability is an additional requirement for class action certification that the Third Circuit has identified as rooted in the nature of class actions themselves. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015). To satisfy the ascertainability requirement, 1) "the class must be defined with reference to objective criteria," and 2) "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013).

Applying this two-prong test, I cannot conclude from the face of the complaint that the proposed classes are patently unascertainable. The proposed classes meet the requirement of definition through reference to objective criteria: one can objectively determine whether plaintiffs or their family members entered into agreements with Defendants and whether Defendants had the appropriate plots available. *See Marcus v. BMW of North America, LLC*, 687 F.3d 583, 593 (3d Cir. 2012). Plaintiffs further contend that access to Defendants' records through discovery will provide a "reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition," which would satisfy the second prong. *See Hayes*, 725 F.3d at 355. Discovery may establish that the classes are not, in fact, ascertainable, but I cannot say at this stage that Plaintiffs will be unable to meet this requirement under the Third Circuit's standard.[1] Because the Court of Appeals has not analyzed ascertainability by employing fail-safe concepts, I see no need to examine whether the

---

[1] In that regard, I note that most of the cases in which the Third Circuit has examined ascertainability have concerned decisions at the class certification stage, not motions to strike. *See City Select Auto Sales, Inc. v. BMW Bank of North Am. Inc.*, 867 F.3d 434, 435 (3d Cir. 2017); *Byrd*, 784 F.3d at 158; *Carrera v. Bayer Corp.*, 727 F.3d 300, 303 (3d Cir. 2013); *Marcus*, 687 F.3d at 588.

proposed classes are fail-safe classes[2] and to what extent that might impede ascertainability.[3]  I will not grant the Motion to Strike on the grounds of ascertainability.

Defendants next question Plaintiffs' adequacy as representatives and the typicality of their claims.  They argue that the named Plaintiffs' claims are not typical, and that they are therefore not adequate representatives, because their claims are subject to unique defenses.  In support of this contention, Defendants cite only one case, but it was decided at the class certification stage, *Ritti v. U-Haul Int'l, Inc.*, 2006 WL1117878, at *1 (E.D. Pa. Apr. 26, 2006), supporting the conclusion that more information is warranted before assessing typicality and adequacy.  I certainly see no reason to strike the class allegations at this early stage without the benefit of a developed factual record to allow for thorough analysis.  *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309-10 (3d Cir. 2008).

I reach the same conclusion with respect to Defendants' arguments regarding the predominance of individual issues.  Defendants rely on factual contentions and assertions about the varied nature of potential class members' contracts.  I addressed similar arguments in *Landau v. Viridian Energy PA LLC*, where the defendant claimed that variations across contracts prevented a class action with respect to a breach of contract claim.  223 F. Supp. 3d 401, 422

---

[2] That said, the classes do not appear to constitute fail-safe classes from the face of the complaint.  A fail-safe class is generally understood as "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Zarichny*, 80 F. Supp. 3d at 623 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)).  Defendants seem to allege that here membership in the class is defined by members' ability to make out a claim for breach of contract. Defs.' Mot. Strike and Dismiss 10.  On its face, however, the proposed class definition is dependent only on a showing that members entered into an agreement with Defendants and that Defendants did not have the appropriate plot available.  While that definition may require members to establish breach, it does not require them to establish damages, another essential element of a contracts claim.  *See McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010).  Thus, liability need not be determined in order to determine class membership.

[3] Whether a fail-safe class presents an ascertainability problem or another defect in class certification is also unclear.  *Compare Zarichny.*, 80 F. Supp. 3d at 625 (discussing fail-safe classes as an ascertainability problem) *with Alberton v. Commonwealth Land Title Ins. Co.*, 264 F.R.D. 203, 206 (E.D. Pa. 2010) (discussing fail-safe classes as a problem with the class definition in the context of the adequacy of representatives requirement).

(E.D. Pa. 2016). I found that motion to be premature and concluded that, absent discovery, there was not a sufficient basis to dismiss the class allegations. *Id.* Likewise, Defendants here contend that the issues in this case will turn on the specific terms of varied contracts. Again, I find that discovery is warranted prior to making a determination regarding the class allegations. *See id.* I will not be able to undertake the necessary "rigorous analysis" to decide whether the requirements of Rule 23 have been satisfied without a more developed factual record. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 309. The Motion to Strike is therefore denied.

### b. Motion to Dismiss

Defendants next move to dismiss various counts of the Complaint.

#### i. Negligence

Defendants move to dismiss Count I on the grounds that both the gist of the action doctrine and the economic loss doctrine bar Plaintiffs' negligence claim. Although I do not agree that the gist of the action doctrine bars the claim, I find that because Plaintiffs have failed to sufficiently allege emotional distress, their claim is exclusively economic in nature, with the result that the economic loss doctrine bars the negligence action.

The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). The doctrine developed out of concern for the scope of tort liability when, at common law, recovery for solely economic loss was limited to the realm of contract. *Landau*, 223 F. Supp. 3d at 413. Courts in this District have found that "[t]o avoid application of the economic loss doctrine, a plaintiff must articulate 'harm that is distinct from the disappointed expectations evolving solely from an agreement.'" *Doe v. Trustees of Univ. of Pa.*, 270 F. Supp. 3d 799, 829 (E.D. Pa. 2017) (quoting *Sunburst Paper, LLC v. Keating*

9

*Fibre Int'l, Inc.*, 2006 WL 3097771, at *3 n.3 (E.D. Pa. Oct. 30, 2006)). Here, the losses Plaintiffs allege they suffered as a result of the inability to be buried alongside their loved ones are purely economic and indistinguishable from the harm of not receiving the benefit of their bargains.

To understand why this is the case, it is necessary to review Pennsylvania law on emotional distress. Pennsylvania law permits recovery for negligent infliction of emotional distress in four contexts, including where the defendant had a contractual or fiduciary duty toward the plaintiff. *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217 (Pa. Super. Ct. 2012). A plurality of the Pennsylvania Supreme Court has indicated that this category refers to "those cases where there exists a special relationship where it is foreseeable that a breach of the relevant duty would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting stress." *Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 84 (Pa. 2011). Based on the steady expansion of recovery for emotional distress, the cultural and religious significance of the burial of loved ones, and the margin by which the *en banc* Superior Court recognized a special relationship in *Toney*,[4] I predict that Pennsylvania courts would find such a special relationship between burial services providers and individuals who purchase interment rights or their next of kin. *See id.* at 91-95.

Nonetheless, Plaintiffs' Complaint here is lacking because Plaintiffs fail adequately to allege emotional distress. To recover damages for emotional distress under a negligence theory, a plaintiff must have experienced physical injury. *Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. Ct. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) (citing *Armstrong v. Paoli Mem'l Hosp.*,

---

[4] The Supreme Court in *Toney* was equally divided. *Id.* at 84. But the Superior Court, sitting *en banc*, endorsed recovery by a vote of 7-2. *Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 195 (Pa. Super. Ct. 2008), *aff'd*, 36 A.3d 83, 84 (Pa. 2011)

633 A.2d 605, 609 (Pa. Super. Ct. 1993)). On this point, the parties agree. Plaintiffs suggest, however, that the "physical injury" requirement may be satisfied by vague statements of "emotional harm" without any indication of physical symptoms. To the contrary, Pennsylvania courts have consistently required plaintiffs to allege physical manifestations of their emotional suffering. *See, e.g.*, *Love v. Cramer*, 606 A.2d 1175, 1179, 1179 n.5 (Pa. Super. Ct. 1992); *Abadie v. Riddle Mem'l Hosp.*, 589 A.2d 1143, 1145 (Pa. Super. Ct. 1991). The very cases on which Plaintiffs rely all involved averments of physical manifestations of emotional harm. In *Toney*, the plaintiff had experienced shock, rage, grief, humiliation, trauma, depression, anxiety, continued nausea and headaches, insomnia, nightmares, flashbacks, and other symptoms. 961 A.2d at 200. In *Armstrong*, the plaintiff alleged loss of continence, depression, nightmares, and insomnia. 633 A.2d at 609. In *Love*, the court held that "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and . . . ongoing mental, physical and emotional harm" sufficiently stated physical manifestations of emotional suffering to sustain a cause of action. 606 A.2d at 1179. The court in *Love* expressly distinguished the specific allegations there from cases where allegations of psychological and emotional damage absent physical harm were deemed insufficient. *Id.* at 1179 n.5.

These Pennsylvania cases establish a standard that Plaintiffs' First Amended Complaint does not meet. In recounting the experiences of Ms. Bernstein and Ms. Schwartz, Plaintiffs state only that they each suffered "an ascertainable loss." Pl.'s Am. Compl. 4, 6. In the Facts section, Plaintiffs aver that they "have been harmed," *id.* at 18, and repeatedly state that they were "damaged," *id.* at 20-21, without elaboration. With respect to the negligence claim, Plaintiffs aver simply that they "suffered economic and non-economic damages." *Id.* at 25. In fact, it is only in the discussion of Count III, the Unfair Trade Practices and Consumer Protection Law

11

(UTPCPL) claim, that Plaintiffs allege they suffered "severe emotional distress." *Id.* at 31. None of these averments are sufficient to make out a claim of negligent infliction of emotional distress under Pennsylvania law.

Without emotional distress damages recoverable in negligence, Plaintiffs can only hope to recover economic damages resulting from the burial of their loved ones in an incorrect grave, or the burial of another in their pre-purchased plot. From the facts averred, such damages could conceivably include costs associated with disinterment and reburial or from the difference in value of the plot bargained for and the plot received. Any such damages are economic in nature, and would stem directly from the contract, with the result that the economic loss doctrine bars their recovery under a negligence theory.

In the absence of non-economic damages, there is no need to reach the question of whether Pennsylvania would recognize an independent duty in tort that would preclude application of the gist of the action doctrine. Plaintiffs make a strong case that Pennsylvania would recognize such a duty under the factors set forth in *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000), but further discussion of the question is unwarranted.

### ii. UTPCPL

In moving to dismiss claims alleging violations of the Unfair Trade Practices and Consumer Protection Law (UTPCPL), Defendants assert that Plaintiffs have not alleged justifiable reliance or ascertainable loss and that UTPCPL claims are unfit for class actions because individual issues predominate. I address these issues in turn.

A plaintiff must demonstrate justifiable reliance on the defendant's wrongful conduct or representation. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 224 (3d Cir. 2008). But Defendants' argument that Plaintiffs have not alleged with particularity that they relied on Defendants'

representations overlooks a fundamental premise of bilateral contracts: each party's undertaking forms the essence of the agreement. Put differently, but for their reliance on Defendants' representations, Plaintiffs would not have relinquished ownership and control of their loved ones' remains nor would they have paid for Defendants' services. Defendants also ignore portions of the First Amended Complaint that contain facts to support the claim of reliance. This resembles *Landau*, where I found that the plaintiff's averments about information and assurances the defendant provided supported the plaintiff's claim of reliance. *Landau*, 223 F. Supp. 3d at 419. Similarly, Plaintiffs in this case allege that they were informed at the time of purchase that they would be buried next to their loved ones. Pl.'s Am. Compl. 3-4. Plaintiffs further expressly state that they "justifiably relied on the Defendants' conduct and omissions," expecting that Defendants would not bury their loved ones in another plot or place another person in their pre-purchased plot. *Id.* at 30-31. I find that a reasonable consumer in Plaintiffs' position would have been misled by Defendants' assurances, and I conclude that the facts pled support a reasonable inference of justifiable reliance. *See Landau*, 223 F. Supp. 3d at 419.

Plaintiffs also sufficiently allege an ascertainable loss. Defendants seem to suggest that no ascertainable loss can be inferred from the fact that Plaintiffs purchased a set of side-by-side plots in a specified area yet did not receive the side-by-side plot arrangement they were promised. I disagree. Plaintiffs allege that they entered into an agreement for side-by-side plots and did not receive them. Therefore, the measure of Plaintiffs' loss is the difference between the market value of the side-by-side plots at the time of their purchase and the current market value of the sites they ultimately received, plus or minus the attendant costs of disinterment and reburial, if any. This loss should be readily ascertainable, either from Defendants' records or comparable evidence of the market values of such plots. It may be that the gravesites Plaintiffs

ultimately received are of equal value to the sites originally purchased, but that is not apparent from the Amended Complaint, where Plaintiffs repeatedly allege that they did not receive the particular plots they purchased.

Defendants again argue against the class action allegations, claiming that a UTPCPL action requires individual determinations of justifiable reliance and is therefore unfit for class certification. I find this question, like those implicated in the Motion to Strike, premature, and decline to dismiss on these grounds before the class certification stage. Defendants seem to urge me to conclude that UTPCPL claims are inherently unfit for class certification due to the requirement that plaintiffs prove justifiable reliance. I am not prepared to draw such a conclusion regarding Pennsylvania law when Pennsylvania courts have not yet done so. *See Hunt*, 538 F.3d at 227 n.17 (3d Cir. 2008); *Debbs v. Chrysler Corp.*, 810 A.2d 137, 157 (Pa. Super. Ct. 2002) (recognizing an exception to the requirement of proof of individual detrimental reliance under the UTPCPL that, if applicable, could allow class certification of a UTPCPL claim). I similarly decline to bypass the entire class certification process by presuming at this early stage that Plaintiffs will be unable to show that common issues predominate. *See Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d. 476, 498 (E.D. Pa. 2016). Even if Plaintiffs' burden of establishing commonality proves difficult, I see no compelling reason to deprive them of the opportunity to attempt to meet it.

### iii. Breach of Duty of Good Faith and Fair Dealing

Plaintiffs cannot sustain their claim based on breach of the duty of good faith and fair dealing, and Defendants' Motion will be granted with respect to Count IV. No separate, independent cause of action based on breach of the duty of good faith and fair dealing exists under Pennsylvania law. *Landau*, 223 F. Supp. 3d at 410 (citing *Gallo v. PHH Mortg. Corp.*,

14

916 F. Supp. 2d. 537, 551 (D. N.J. 2012)). Rather, courts applying Pennsylvania law have found that such a claim is subsumed within a separately pled breach of contract action. *See Mittman v. Nationwide Affinity Ins. Co.*, 2017 WL 1319445, at *3 (E.D. Pa. Apr. 10, 2017); *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 430 (E.D. Pa. 2015). Plaintiffs here have pled "a nearly word-for-word restatement" of their breach of contract claim. *See Landau*, 223 F. Supp. 3d at 410. Despite Plaintiffs' protestations to the contrary, every allegation made in the breach of duty of good faith and fair dealing claim (Count IV) duplicates an allegation in the breach of contract claim (Count II). Plaintiffs' assertion that "Defendants acted in bad faith and/or with a malicious motive," Pl.'s Resp. Opp'n. 25, does not convert the insufficient claim into an independent cause of action. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013). Accordingly, Defendants' Motion to Dismiss Count IV is granted.

For the foregoing reasons, I deny the Motion to Strike Class Allegations, and I grant the Motion to Dismiss in part and deny it in part. The Motion to Dismiss is granted with respect to the negligence claim in Count I and the breach of duty of good faith and fair dealing claim in Count IV but denied with respect to the UTPCL claim in Count III.

    /s/ Gerald Austin McHugh
United States District Judge

15