# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAROLINE BERNSTEIN, an individual,** | : | |
| **MARLA UROFSKY on behalf of** | : | |
| **RHEA SCHWARTZ, an individual, on** | : | |
| **behalf of themselves and all others** | : | **CIVIL ACTION** |
| **similarly situated,** | : | **No. 17-4960** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SERVICE CORPORATION** | : | |
| **INTERNATIONAL and** | : | |
| **SCI PENNSYLVANIA FUNERAL** | : | |
| **SERVICES, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

**McHUGH, J.**                                                                                    **January 14, 2020**

## MEMORANDUM OPINION

This is a putative class action in which the named Plaintiffs assert claims for negligence, breach of contract, and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL) against Defendants, a multinational cemetery operator and its Pennsylvania subsidiary. The named Plaintiffs are Caroline Bernstein and Marla Urofsky, who with power of attorney sues on behalf of her mother, Rhea Schwartz.[1] Of Plaintiffs' three claims, the first two—for negligence and for breach of contract—are based on similar allegations. According to Plaintiffs, Defendants oversold burial plots, failed to maintain accurate burial records, failed to maintain sufficient space between plots so as to avoid damage to

---

[1] For ease, throughout the opinion, I will refer to Schwartz as the plaintiff because it is Schwartz, and not Urofsky, who participated in the various events that gave rise to the legal issues I discuss.

adjacent plots, buried remains in incorrect plots, relocated remains without authorization, failed to handle remains with reasonable care, and failed to take any remedial action even after being notified of problematic incidents.  ECF 45, ¶¶ 167, 170.  In their third claim, Plaintiffs allege that Defendants violated the UTPCPL's catchall provision, which prohibits "any person" from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 P.S. §§ 201-2(4)(xxi), 201-3.[2]

Defendants now move for summary judgment as to the named Plaintiffs' individual claims only, arguing that "because Plaintiffs' claims are fatally defective, they cannot lead the proposed class they purport to represent, and thus, this entire action should be dismissed."  ECF 47, at 1;  *see also* Fed. R. Civ. P. 23(a).  Plaintiffs have yet to move to certify a class, and the threshold controlling issue is the viability of their individual claims.

## I.  Background

### A.  Defendants

Defendant SCI Pennsylvania Funeral Services, Inc., is part of a sizable network of funeral services providers wholly owned by co-Defendant Services Corporation International (SCI Global).  SCI Global and companies affiliated with SCI Global own nearly 2,000 funeral service locations and cemeteries across the United States and Canada.  In Pennsylvania, SCI Pennsylvania owns and operates Shalom Memorial Park Cemetery and Roosevelt Memorial Park Cemetery, the two cemeteries at the center of Plaintiffs' claims.  ECF 45, ¶ 59; ECF 46, ¶ 59.

---

[2] Plaintiffs' Third Amended Complaint also alleges a claim for breach of the contractual duty of good faith and fair dealing, but this claim already was dismissed with prejudice per this Court's Order and Memorandum dated December 6, 2018.  ECF 25, 26.  Accordingly, only Plaintiffs' claims for negligence, breach of contract, and alleged UTPCPL violations are properly before the Court.  Plaintiffs argue that their good faith and fair dealing claim is incorporated in their breach of contract claim, and I will address that argument there.

## B. Plaintiff Bernstein

In 1983, after her mother passed away, Caroline Bernstein purchased two adjacent burial plots at Shalom Cemetery, one for her mother and one for her. At Shalom Cemetery, most graves are laid out in 12-foot by 8-foot lots. Each lot includes four graves, with the individual graves typically measuring 32-inches across and 8-feet long. Bernstein's two plots are contained within Shalom Cemetery's Lot Number 771. Bernstein's mother, Irene Zubrin Gordon, was buried in plot 2.



To effectuate the purchase of the plots, Bernstein executed a Sepulcher Agreement with Shalom Cemetery. ECF 47-2. That Agreement, among other things, specified that each plot had to be large enough to encompass a "burial space[] . . . of standard size, not less than 26 inches high, 32 inches wide and 92 inches long." ECF 47-2, ¶ 15; ECF 51-2, Ex. A, ¶ 15. In addition to the Agreement, Bernstein received a "Certificate of Ownership," which mandated that "[n]o portion of the Plot shall be transferred to another person or persons for resale." ECF 51-2, Ex. B.

Bernstein's Sepulcher Agreement also incorporated Shalom Cemetery's Rules and Regulations. In signing the Agreement, Bernstein "agree[d] to comply at all times with the Rules and Regulations promulgated and posted at the Cemetery office, as amended from time to time concerning the operation, care, use, control and preservation of the Cemetery and the

improvements thereof." ECF 47-2, ¶ 14. As relevant here, through regulations in operation since January 2013, "[Shalom] Cemetery reserves and shall have the right to correct any error that may be made in the location of an interment space or placing of an outer burial container," and that "[t]he Cemetery shall have no liability as a result of any error of the type described in this section, other than the obligation to correct it." ECF 47-23, ¶ 80; *see also id.* ¶ 31 (noting that "[t]he Cemetery reserves and shall have the right to correct any errors that may be made by it in making interments . . . including the right to substitute and convey in lieu thereof other Interment Rights of comparable value and similar location (to the extent possible) as may be selected by the Cemetery," and that "[Shalom] Cemetery shall have no liability as a result of any errors of the type described in this paragraph other than its obligation to take the remedial actions described in this paragraph"); *cf.* Defendants' Answer, ECF 46, ¶ 53 (citing Roosevelt's Rules and Regulations, which are substantively identical to Shalom's).

In January 2017, an individual unrelated to Bernstein was buried in the plot to the left of the plot reserved for Bernstein.



The next month, Bernstein, then eighty-two or eighty-three years of age, went with her grandson to Shalom Cemetery to visit Bernstein's mother's grave. While there, they observed the new grave and became concerned that it overlapped with the plot Bernstein had reserved. *See* ECF

45, ¶ 14; *see also id.* at Ex. B (pictures roughly showing proximity of the various plots).

Bernstein and her grandson raised their concern with Shalom Cemetery's General Manager,

Scott Nulty. Bernstein's grandson explained to Nulty that Ms. Bernstein was concerned that the

new grave (Lot 770, plot 4) did not leave sufficient room for her to be buried next to her mother.

Nulty assured Bernstein and her grandson that there was enough room for Bernstein's burial and

that "worse case the casket burial containers would touch." ECF 45, ¶ 17. According to

Bernstein's grandson, Nulty's response concerned both him and Bernstein, as it is "against

Jewish . . . religion to expose another person's grave who has been buried." ECF 51-2, at 4

(citing deposition of Bernstein's grandson, at 23:19-25). Nulty recorded the grandson's phone

number, but the parties had no further communication. Bernstein then filed suit in November

2017.[3]

    Soon after Ms. Bernstein filed suit, and then twice more over the next year or so, Nulty

ordered the plot reserved for Bernstein to be "probed." Probing of grave plots involves inserting

a four-foot long drill into the ground to locate the outer boundaries of the plot. In doing so,

probing can confirm whether the boundaries of the plot have been breached. The parties seem to

dispute the results of the probing exercises—or at least the implications of the results. Nulty did

not record any results from the first probe, and the widths recorded from the second and third

probes, while each suggesting that Bernstein's plot contained sufficient room for burial, varied

meaningfully. The second probe produced a plot width of 41 inches across at the top of the plot

and 37 inches across at the bottom of the plot. The third probe produced a plot width of 51

---

[3] The original complaint was filed by Bernstein and Marjorie Schaefer, ECF 1, but Schaefer ceased to be a plaintiff
by the time of the Second Amended Complaint, ECF 29.

inches across, a variance of about 25 percent.  ECF 52-15, at 67:20-22, 78:6-9.

According to Defendants, the three probing exercises, notwithstanding the variance in measurement, "demonstrated that Bernstein's grave plot at Shalom was and is unoccupied, and there is adequate room for her to be buried there."  ECF 47, at 2.  By contrast, Bernstein takes the variance in measurement to be a feature of a nonscientific, inaccurate process.  To Bernstein, the differences in the probing results meant that Shalom Cemetery could not assure her that the plot she had reserved contained sufficient room for her burial.[4]  After Shalom Cemetery probed Bernstein's plot for the last time in February 2019, Bernstein remained unconvinced that the plot she reserved contained sufficient space for her burial.

Counsel for Defendants then sought to assuage Bernstein's concerns.  On March 28, 2019, counsel for Defendants advised Bernstein's lawyer that they would be opening the plot reserved for Bernstein to check for space, and invited Bernstein and her lawyer to attend:

> In order to confirm that there is ample space for Caroline Bernstein to be buried in her purchased grave space at Shalom Memorial Park, in the David Section, Lot 771, Space No. 1, we plan to open Ms. Bernstein's reserved space on Monday, April 8, 2019 at 11:00 a.m.  We would like to invite you and/or your client to come and observe the opening.  We would also be willing to place a concrete liner in Ms. Bernstein's purchased grave space once opened (at no cost to Ms. Bernstein) so that she can be assured that when the time comes for her to be buried therein there will be sufficient space for her to be placed alongside her mother.  Please advise as to whether you would like to attend the opening.  Thank you in advance for your prompt attention to this matter.

After the parties agreed to an excavation date, Defendants' counsel wrote to Bernstein's lawyer noting that "absent objection from your client, Shalom will pre-install a concrete liner in the

---

[4] Plaintiff also stresses deposition testimony by Nulty in which Nulty admitted that he could not conclusively demonstrate that Bernstein's plot was empty unless the plot was excavated.  *See* ECF 51-2, at 7-9.  Nulty, in response to a question whether probing produces results with "100 percent certainty," responded no, that probing does not produce results with that kind of perfect certainty.  *Id.*  To me, acknowledging an inherent limitation in a testing method only concedes the obvious, and Nulty should not be faulted for candor.

space once it is opened at no cost to your client."  In response, Bernstein's lawyer made clear that they "ha[d] not 'agreed' to your proposed course of action."  ECF 47-15.  Bernstein's lawyer continued:

> [W]e do not agree that we need to accept or object to your proposal to excavate the grave and or place a liner in the grave.  This is a unilateral decision your client has made in response to their inability to confirm that the grave Ms. Bernstein owns is available for her use.  We will be present to observe only.

On May 6, 2019, Defendants excavated Bernstein's grave plot.  Bernstein and her grandson both attended.  The excavation exposed certain portions of adjacent grave plots, including "portions of the vertical walls of concrete liners in adjacent graves."  Defendants' Answer, ECF 46, ¶ 31.  Nevertheless, Defendants were able to install in Bernstein's grave plot a 34-inch by 90-inch concrete liner.

### C.  Plaintiff Schwartz

In 1975, Marc Schwartz passed away.  At the time of Marc's death, Marc's parents— Rhea Schwartz and her late husband Jack—purchased three side-by-side grave plots at Roosevelt Memorial Park Cemetery.  As at Shalom Cemetery, graves at Roosevelt Cemetery are laid out in lots.  Jack and Rhea Schwartz purchased grave plots 1, 2, and 3 in Section N5, Lot 118.  Marc was meant to be buried in plot 3 and Jack, when he died in 2011, was buried in plot 1.

In the fall of 2015, Schwartz, then eighty-six or eighty-seven years of age, went with her daughter Marla to Roosevelt Cemetery to visit Jack's and Marc's graves.  While there, they observed what appeared to be "extra space" in the grave lot between Marc's grave and the plot reserved for Schwartz.  Schwartz and Marla worried that the apparent extra space would allow Roosevelt to bury another person between Marc and the plot reserved for Schwartz.  Schwartz and Marla raised their concern with Roosevelt Cemetery staff.  In response, on October 29, 2015,

David Gordon, Roosevelt Cemetery's General Manager, wrote to Schwartz. In that letter, Gordon sought to mollify Schwartz and Marla's concerns. ECF 45-E. Gordon acknowledged that Schwartz and Marla were "concern[ed] that there is 'extra' space in the plot," but assured Schwartz that "you will eventually be buried between and next to your husband on one side and next to your son on the other." *Id.* He closed, "No stranger will separate your family." *Id.*

In late September 2017, Schwartz and Marla visited Roosevelt Cemetery and observed that Roosevelt had, indeed, buried another person between Marc and the plot reserved for Schwartz. Defendants have conceded that "Marc Schwartz was buried in . . . grave plot number 4, and not . . . grave plot number 3," and that, as a result, "grave plot number 3 appeared to be an available and unsold grave, and the space was used for a burial." ECF 46, ¶ 48.

| Schwartz Plot 1 | Schwartz Plot 2 | Schwartz Plot 3 | *Plot 4* |
|---|---|---|---|
| (burial plot of Jack Schwartz) | (reserved for Rhea Schwarz) | (intended burial plot for Marc Schwartz) | (actual burial of Marc Schwartz) |

To correct its mistake, Roosevelt Cemetery disinterred both Marc and the woman incorrectly buried in plot 3, and rebury each in their correct graves. Gordon wrote to Schwartz, saying that he was "profoundly sorry that this procedure has to happen," and asked that Schwartz "sign the enclosed forms which will give the cemetery permission to move Marc." ECF 45, ¶ 51, Ex. G. The forms included a "Disinterment Order and Authorization for Reinterment or Other Disposition" and an "Interment Order and Authorization." Schwartz signed the forms, thus providing her consent for the reinterment. ECF 45, ¶ 51, Ex. H; ECF 47-29. But in authorizing

Marc's reinterment, Schwartz appears to have struck the forms' indemnity and hold harmless provisions. *Id.* Those provisions would have indemnified and held harmless the cemetery and its affiliates for losses or liability in connection with misrepresentations, negligence, or other misconduct related to the reinterment. ECF 45-H.

Like Bernstein, Schwartz's Sepulcher Agreement incorporated Roosevelt Cemetery's Rules and Regulations. Through the Agreement, Schwartz's interment rights "shall be subject at all times to the by-laws, rules and regulations of ROOSEVELT, now existing and as hereafter modified, changed or adopted, as though hereinafter set forth." ECF 47-20, ¶ B.3. The regulations in effect at the time of Marc's reinterment provided that "[Roosevelt] cemetery reserves and shall have the right to correct any errors that may be made by it in making interments [or] disinterments"; that "[i]n the event such error shall involve the interment of the remains of any person in an incorrect location, the Cemetery reserves and shall have the right to remove and transfer such remains so interred to the correct location or to a similar location of comparable value"; and that "[Roosevelt] Cemetery shall have no liability as a result of any errors of the type described in this paragraph other than its obligation to take the remedial actions described in this paragraph." ECF 47-22, ¶ 31; *see also id.* ¶ 80 (noting that "[Roosevelt] Cemetery reserves and shall have the right to correct any error that may be made in the location of an interment space" and that "[t]he Cemetery shall have no liability as a result of any error of the type described in this section, other than the obligation to correct it"); Defendants' Answer, ECF 46, ¶ 53 (citing Roosevelt's Rules and Regulations).

## II.    Summary Judgment Standard

Defendants' motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317,

322-23 (1986).  Viewing the evidence in the light most favorable to Plaintiffs as the nonmoving

party, I consider whether Defendants have shown "that there is no genuine dispute as to any

material fact and [that they are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.    Discussion

Plaintiffs bring three claims against Defendants—for negligence, breach of contract, and

violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law.  I analyze

each in turn.  As a threshold matter, I conclude that neither the economic loss doctrine nor the

gist of the action doctrine prevent Plaintiffs from pursuing a negligence claim.  Nonetheless, I

further conclude that Plaintiffs' negligence claim cannot survive summary judgment because

Defendants have not breached any relevant tort-based duties they may have owed Plaintiffs.  As

to Plaintiffs' breach of contract claim, I conclude that Defendants have not breached any of the

contractual duties they owed to Plaintiffs, and that both Bernstein and Schwartz will receive the

benefits of their bargains.  Finally, as to Plaintiffs' UTPCPL claim, I conclude that neither

Plaintiff has suffered an ascertainable loss associated with any action by Defendants.

### A.  Plaintiffs plead a negligence claim independent of their contract claim

*1.  The economic loss doctrine does not bar Plaintiffs' negligence claim because
they adequately allege emotional distress.*

In Pennsylvania, courts use two methods to determine whether tort claims that

accompany contract claims can survive as freestanding causes of action—the "economic loss"

doctrine and the "gist of the action" doctrine.[5]  The economic-loss doctrine "prohibits plaintiffs

---

[5] The Pennsylvania Supreme Court has neither adopted nor rejected the economic loss doctrine.  But Pennsylvania's
intermediate appellate courts have long applied it.  *See, e.g.*, *REM Coal Co., Inc. v. Clark Equip. Co.*, 563 A.2d 128
(Pa. Super. Ct. 1989).  The Third Circuit has predicted that the Pennsylvania Supreme Court would adopt the
version of the economic loss doctrine that the United States Supreme Court developed in *East River S.S. Corp. v.*

from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). The Court of Appeals further explained that a plaintiff should be limited to a contract claim, and barred from raising a negligence claim, "when loss of the benefit of a bargain is the plaintiff's sole loss." *Duquesne Light*, 66 F.3d at 618.[6] Thus, under the economic loss doctrine, "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Technologies, Inc. v. Columbia Gas Co. of Pennsylvania*, 985 A.2d 840, 841 n.3 (Pa. 2009). "To avoid application of the economic loss doctrine, a plaintiff must articulate 'harm that is distinct from the disappointed expectations evolving solely from an agreement.'" *Doe v. Trustees of Univ. of Pa.*, 270 F. Supp. 3d 799, 829 (E.D. Pa. 2017).

On the facts here, the only conceivable noneconomic loss Plaintiffs can claim is emotional distress. Earlier in this case, I granted Defendants' Motion to Dismiss Plaintiffs' negligence claim because Plaintiffs had failed to plead the level of physical injury necessary to support such a claim. *See Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. Ct. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011). Now, in the current Third Amended Complaint, both Plaintiffs, albeit marginally, have alleged physical manifestations of emotional distress sufficient to support a claim grounded in tort.

---

*Transamerica Delaval, Inc.*, 476 U.S. 858 (1986). *See King v. Hilton-Davis*, 855 F.2d 1047, 1053-54 (3d Cir. 1988).

[6] The United States Supreme Court adopted the doctrine in an admiralty products liability case, holding that "a manufacturer in a commercial context has no duty under either negligence or strict-liability theory to prevent a product from injuring itself." *East River*, 476 U.S. at 871. Though the Court recognized the need for products liability law to protect consumers from dangerous products, the Court voiced concern that if products liability remedies "were to progress too far, contract law would drown in a sea of tort." *Id.* at 866.

Bernstein has offered expert testimony showing that she suffers from persistent "adjustment disorder with mixed anxiety and depressed mood, chronic," which was caused by her initial visit to the cemetery in 2017, viewing the adjacent grave, and surmising that there was not sufficient room for her to be buried between her late-husband and son. ECF 51-Q (Independent Psychiatric Evaluation of Bernstein). The physical manifestations of her emotional distress include negative changes to her appetite and loss of sleep. *Id.* at 3-4; *see also* ECF 47-3, at 22:4-23 (Dep. of Bernstein) ("[L]ast year when this happened at the cemetery, I was very upset. Didn't sleep. Walked the floors.").

Similarly, Schwartz has offered expert testimony showing that she suffers from "adjustment disorder with mixed anxiety and depressed mood, chronic," which was caused by her visit to Roosevelt and the discovery that her son was buried in the wrong grave. ECF 51-S (Independent Psychiatric Evaluation of Schwartz). The physical manifestations of Schwartz's emotional distress include a measure of insomnia. *Id.* at 3-4.

Defendants dispute Plaintiffs' injuries, but I will set aside any reservations and assume that Plaintiffs' expert reports offer at least the minimum indicia required to support a claim for emotional distress under Pennsylvania law. Consequently, the economic loss doctrine would not bar Plaintiffs' negligence claim.

> ### 2. The gist of the action doctrine need not be separately considered because it is subsumed within an analysis of whether Defendants breached any tort duties

Similar to the economic loss doctrine, the gist of the action doctrine works to prevent plaintiffs from recovering in tort for injuries stemming from breaches of contract. Under the gist of the action doctrine, "to be construed as a tort action, the tortious wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Bohler-Uddeholm*

*America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103 (3d Cir. 2001). That is, the tortious wrong must be the real point of the action—its essence. *See id.* at 104. Because tort actions arise from breaches of duties imposed as a matter of policy, while contract actions arise from breaches of duties imposed by mutual consent, if "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts," then the claim should be limited to a contract claim. *Id.*; *see also Redevelopment Auth. of Cambria County v. International Ins. Co.*, 685 A.2d 581, 590 (Pa. Super. Ct. 1996) (en banc). To avoid application of the gist of the action doctrine, the plaintiff must articulate some noncontractual duty the defendant breached that gave rise to her injuries.

At the motion to dismiss stage, because the economic loss doctrine was enough to bar Plaintiffs' negligence claim, I saw "no need to reach the question of whether Pennsylvania would recognize an independent duty in tort that would preclude application of the gist of the action doctrine." ECF 25, at 12. I further observed that "Plaintiffs make a strong case" that Pennsylvania law "would recognize an independent duty in tort that would preclude application of the gist of the action doctrine." ECF 25 at 12.

Now, Plaintiffs have stated cognizable claims for negligent infliction of emotional distress. Thus, I must determine if "the tortious wrong ascribed to the defendant [is] the gist of the action with the contract being collateral." *Bohler-Uddeholm*, 247 F.3d at 103. But I need not engage in a lengthy analysis of the factors recognized by the Supreme Court in *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000), because even if one defines Defendants' duty in broad terms, the record here does not support a breach.

**B. Defendants have not breached any tort-based duties owed to Plaintiffs**

Plaintiffs' Third Amended Complaint alleges that Defendants oversold burial plots; failed to maintain accurate burial records; failed to maintain sufficient space between burial plots; buried remains in the wrong plots; relocated remains without notification or authorization; failed to handle remains with reasonable care; and failed to pursue remedies after being put on notice of these incidents. ECF 45, at 29-30, ¶ 158. Viewing the record evidence in the light most favorable to Plaintiffs, I conclude that there is insufficient evidence that Defendants breached any duties owed to Plaintiffs.

To begin, Ms. Bernstein has offered no evidence that Defendants engaged in any of the breaches alleged in the current Complaint. She has offered no evidence that Defendants oversold her burial plots; buried any relevant person's remains in the wrong plots; relocated any relevant person's remains without notification or authorization; failed to handle any relevant remains with reasonable care; or failed to pursue remedies after being put on notice of problematic incidents. Nor has Bernstein alleged sufficient evidence to show that Defendants failed to maintain accurate burial records or to maintain sufficient space between burial plots. Shalom Cemetery's records show that both plots 1 and 2 in Lot 771 were sold to and reserved for Bernstein. *See* ECF 45-D. Further, none of Defendants' repeated probes of Bernstein's plot suggested that it contained insufficient room for her eventual burial. Finally, Defendants' installation of a standard-sized concrete liner seems to conclusively demonstrate that the plot contains sufficient space for an eventual burial. Thus, even crediting Bernstein's claim that she has suffered noncontractual injury, none of those injuries were caused by Defendants breaching any tort-based duty.

Similarly, Ms. Schwartz has not offered any evidence to support her claim that Defendants oversold burial plots reserved for her; failed to maintain sufficient space between burial plots; failed to handle remains with reasonable care; or failed to pursue remedies after being put on notice of problematic incidents. Schwartz has offered evidence that Defendants buried remains in the wrong plots and, correspondingly, failed to maintain accurate burial records of who was buried where. But such a breach is incapable of surviving summary judgment because Schwartz does not allege—and the record does not reveal—that Defendants acted intentionally or wantonly in misburying Marc in 1975.

The Pennsylvania Supreme Court recognizes the tort of interference with a dead body under the prescription offered by the First Restatement of Torts. *See Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970). Under *Papieves*, "one who wantonly mistreats or, acting without privilege, intentionally withholds the body of a decedent is liable in tort to the member of the decedent's family who is entitled to the disposition of the body." *Id.* at 120 (internal quotations omitted) (citing Restatement (First) of Torts § 868 (1939)). Recently, the Pennsylvania Superior Court clarified that, under Section 868, "a party can plead that the defendant acted with a wanton state of mind in the mistreatment of a body . . . or that the defendant acted intentionally . . . or that the defendant acted with both states of mind." *Weiley v. Albert Einstein Med. Cntr.*, 51 A.3d 202, 209 (Pa. Super. Ct. 2012). But *Weiley* refused to expand the predicate mental state to include negligence. *Id.* at 214 ("Pennsylvania has not yet adopted the revised version of section 868 to include negligent interference with a body, and we are currently restricted to the *Papieves* Court's limitation of this tort to wanton or intentional conduct in accordance with the First Restatement of Torts section 868."); *see also Hackett v. United Airlines*, 528 A.2d 971, 974 (Pa. Super. Ct. 1987).

15

Neither party contends that Defendants intentionally misburied Marc's body. The question then is whether they acted "wantonly." *Papieves* explains that wanton mishandling of a body has been found to include, as relevant here, "the unlawful interment or disinterment of a body . . . and other intentional, reck[l]ess or wanton acts likely to cause severe emotional distress." *Papieves*, 263 A.2d at 120. The Court summarized that "the underlying, and we believe real, issue is the right of a decedent's nearest relatives to protection against intentional, outrageous or wanton conduct which is peculiarly calculated to cause them serious mental or emotional distress." *Id.* at 121.

No such intentional, outrageous, or wanton conduct occurred here. No doubt Defendants erred in 1975 when they misburied Marc in plot 4 instead of plot 3. Roosevelt Cemetery staff also erred when they claimed to Schwartz that "no stranger will separate your family" before investigating or disclosing that a stranger had, in fact, mistakenly been buried in Marc's assigned plot. But Schwartz does not contend that those actions were intentional or wanton. Thus, whatever genuine emotional distress Defendants caused Schwartz by Marc's misburial, none was caused by anything more than Defendants' negligence. Further, once Defendants became aware of Marc's incorrect burial in plot 4, they quickly rectified the problem, and did so carefully and with Schwartz's consent. Instead of fully disinterring Marc, Defendants conducted a "slide only" reinterment, *see* ECF 47-29, which was overseen by Schwartz's Rabbi, ECF 47-21, at 58:7-61:25. By sliding Marc's casket from plot 4 to plot 3, the casket never broached the cemetery floor.

I thus conclude that neither Bernstein nor Schwartz can survive summary judgment on their negligence claim. Defendants' errors are regrettable. And concluding that Plaintiffs cannot survive summary judgment on their negligence claim in no way discounts any distress they have

suffered, especially Ms. Schwartz.  Nevertheless, the result I reach here is one compelled by

Pennsylvania law.

### C.  Defendants have not breached any contractual obligations owed to Plaintiffs

Defendants further move for summary judgment on Plaintiffs' breach of contract claim.

To succeed on their breach of contract claim, Plaintiffs must show a valid and enforceable

contract, a breach of material term contained in that contract, and damages resulting from that

breach.[7]  Reviewing the evidence in the record in the light most favorable to Plaintiffs, I

conclude (i) that Defendants did not owe to Plaintiffs certain of the contractual duties alleged, or

(ii) that Defendants have not breached any material terms in the Sepulcher Agreements.[8]

*1. Bernstein will receive the benefits of her bargain.*  The contractual benefits owed to

Ms. Bernstein are described in the 1983 Sepulcher Agreement she executed with a Shalom

Cemetery representative.  Pursuant to that Agreement, as discussed, Bernstein bargained for two

adjacent rights of interment, one for her and one for her mother.  Each right of interment includes

the right to a "burial space[] . . . of standard size, not less than 26 inches high, 32 inches wide

and 92 inches long."  ECF 47-2, ¶ 15.  In addition to the interment rights included in the

Agreement, Bernstein received a "Certificate of Ownership," which mandated that "[n]o portion

of the Plot shall be transferred to another person or persons for resale."  ECF 51-2, Ex. B.

Bernstein's core allegations derive from Defendants' installation of a concrete liner measuring

34-inches by 90-inches.  Bernstein argues that that installation breaches the Agreement because

---

[7] Neither party contends that the Sepulcher Agreements signed by Bernstein (in 1983) or Schwartz (in 1975) are invalid or unenforceable.

[8] Plaintiffs, in their Third Amended Complaint, support their breach of contract claim with a series of allegations that largely restate their negligence claim.  I have dealt with all claims germane to the breach of contract claim here, and all claims germane to the negligence claim in the preceding section.

the liner is 2-inches shorter than the minimum length detailed by the Agreement.  Bernstein also argues that the installation of the shorter-than-promised liner was necessitated by the encroachment of an adjacent grave, meaning that she will not receive two full rights of interment, as promised.

Despite minor deviations from contractual promises, Defendants have substantially performed their contractual obligations.  In Pennsylvania, the equitable doctrine of substantial performance protects "those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects."  *Mort Co. v. Paul*, 76 A.2d 445, 447 (Pa. Super. Ct. 1950).  This line of authority incorporates the established common law maxim *de minimis non curat lex*.  Defendants have substantially performed here.  It is true, as Bernstein emphasizes, the concrete liner installed by Defendants is two inches shorter than promised in the Agreement (90 inches instead of 92 inches).  But it also is two inches wider than the width specified in the Agreement (34 inches instead of 32).  Indeed, the concrete liner installed by Defendants contains more total square inches than the burial space Bernstein bargained for in the Agreement.[9]  Such miniscule deviations from the dimensions specified in the Agreement are not enough to support a breach of contract, especially when the result is a larger space than the one for which Bernstein bargained.

---

[9] Through the Agreement, Bernstein purchased two "burial spaces . . . of standard size, not less than 26 inches high, 32 inches wide and 92 inches long."  ECF 47-2, ¶ 15.  Omitting height, those dimensions amount to 2,944 square inches, or about 20.5 square feet.  The concrete liner installed by Defendants is 34 inches wide and 90 inches long, which amounts to 3,060 square inches, or about 21.25 square feet.

Perhaps anticipating that her contract claim would rise or fall on minor geometric deviations in the concrete liner installed in the grave plot, Bernstein also argues that "Defendants breached the implied duty of good faith and fair dealing" by acting in bad faith to evade the spirit of the bargain. ECF 51-2, at 27. According to Bernstein, by bargaining for two rights of interment of a particular size, she also bargained for various implied rights, including not having Defendants excavate her grave, not being exposed to the grave of her mother or adjacent graves, and being able to rely on Defendants' records to ensure that her contractual rights were being honored. ECF 51-2, at 27.

Bernstein is correct that all contracts executed under Pennsylvania law include an implied duty of good faith and fair dealing. Bernstein also is correct that my decision to dismiss her good faith and fair dealing claim at the motion to dismiss stage does not necessarily preclude her pursuing that argument here as a part of a breach of contract count. *See* ECF 25, at 14-15. But a necessary implication of my observation that a good faith and fair dealing claim may not be maintained as an independent cause of action is that, to succeed on such a claim, Bernstein must still demonstrate that Defendants breached a specific contractual duty imposed by the contract. In other words, she must establish that Defendants breached a specific duty imposed by the Agreement other than the covenant of good faith and fair dealing, and that she incurred damages as a result. *CRS Auto Parts, Inc. v. National Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 369 (E.D. Pa. 2009).

Bernstein has failed to do that here. Not only have Defendants substantially performed all material obligations they owed to Bernstein, Bernstein's Sepulcher Agreement allows Shalom Cemetery "to correct any error that may be made in the location of an interment space or placing of an outer burial container," and provides that "[t]he Cemetery shall have no liability as a result

of any [such] error." ECF 47-23, ¶ 80.  Because I have concluded that Defendants have upheld their end of the bargain—that they have not breached any contractual duty owed to Bernstein—it follows that Defendants have not breached any derivative duty of good faith and fair dealing they may have owed Bernstein.

*2. Schwartz will receive the benefits of her bargain.*  Like Bernstein, Ms. Schwartz will receive the benefits of her bargain.  Schwartz, in opposing summary judgment, seems to make just one argument supporting breach.  Schwartz argues that Defendants' breach occurred when they disinterred Schwartz's son Marc from plot 4, the incorrect grave in which he was originally buried, and reinterred him in plot 3, the plot reserved by Schwartz for Marc in 1975.  ECF 51-2, at 27-28.  Schwartz claims that "the benefits that [she] bargained for was the interment of her son in space 3 on a *single occasion*, and not the disinterment and reinterment of him forty years later."  ECF 51-2, at 28.  In other words, the bargain Schwartz struck was the interment of her son Marc in the correct plot on the first try.

For two reasons, Schwartz has not done enough to survive summary judgment.  First, even if Schwartz bargained for the benefit of a single interment, she consented to Marc's disinterment and reinterment in plot 3.  ECF 47-29.  Thus, whatever contractual harm Schwartz may have suffered has since been rectified, and with her consent.  Second, Schwartz, through the Sepulcher Agreement, agreed to allow Roosevelt Cemetery "to correct any errors that may be made by it in making interments [or] disinterments," including those "involv[ing] the interment of the remains of any person in an incorrect location," and that "[Roosevelt] Cemetery shall have no liability as a result of any [such] errors."  ECF 47-22, ¶ 31.

Schwartz perhaps could have maintained a claim for breach of contract when she originally discovered, in 2015, that Marc was incorrectly buried in plot 4.  Schwartz purchased

the interment rights to plots 1, 2, and 3 in 1975, soon after her son had died. ECF 47-20. And the record reveals that Schwartz intended Marc to be buried in plot 3. *See, e.g.*, ECF 47-21, at 9, 41:3-11 (deposition of Schwartz) (confirming for counsel for Defendants that she "purchased these sites in response to Marc's death . . . [a]nd Marc was going to be buried in site number three"). But even if Schwartz had brought a claim for breach of contract then and subsequently prevailed, the most sensible remedy would have been specific performance of the contract term she alleged was breached. In other words, if Schwartz had prevailed on a breach of contract suit filed after first discovering that Marc had been incorrectly buried in plot 4 in contravention of a material term in the contract, almost inevitably the judicial remedy would have been an order instructing the parties to do just what they did here—agree, with as much care as possible, to move Marc to plot 3.[10]

### D. Defendants have not violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law[11]

Finally, Defendants move for summary judgment on Count III of Plaintiffs' Complaint, which asserts a claim under the UTPCPL. Specifically, the Complaint alleges that Defendants

---

[10] To be sure, compensatory damages are the rule and equitable remedies—like ordering specific performance—remain the exception. But sepulcher agreements are no ordinary contracts. Nevertheless, Defendants now have provided that which Ms. Schwartz contends the Agreement requires.

[11] Unlike Plaintiffs' tort claims, Defendants do not assert that the economic loss doctrine bars Plaintiffs' UTPCL claim. In *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401 (E.D. Pa. 2016), I explored in detail whether a UTPCPL claim is barred by the economic loss doctrine. Specifically, I examined a divergence between how the Third Circuit and how the Pennsylvania Superior Court analyzed the issue. *Id.* at 411. The Third Circuit, in *Werwinski*, predicting how the Pennsylvania Supreme Court would rule, held that the economic loss doctrine applied to statutory fraud claims, including those arising under the UTPCPL. *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002). At the time *Werwinski* was decided, in 2002, no Pennsylvania appellate court had considered whether the economic loss doctrine barred UTPCPL claims when the injuries flowed from a breach of contract. But by the time I decided *Landau*, in 2016, the Pennsylvania Superior Court had twice repudiated *Werwinski*, holding that the economic loss doctrine barred only "'cause[s] of action in negligence that result solely in economic damages unaccompanied by physical injury or property damage[s].'" *Landau*, 223 F. Supp. 3d at 411 (citing *Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. Ct. 2013)); *see also Dixon v. Northwestern Mutual*, 146 A.3d 780 (Pa. Super. Ct. 2016). I concluded that the appropriate course was to apply *Knight* and *Dixon*.

engaged in unfair and deceptive acts insofar as they made various contractual commitments to Plaintiffs and then did not honor those commitments. *See* Compl., ECF 45, ¶ 186.

Defendants argue that this claim fails on several grounds. Their first argument—that Plaintiffs have failed to allege an "ascertainable loss" as required under the UTPCPL—is sufficient to resolve the claim. "To maintain a private right of action under the UTPCPL, a plaintiff must demonstrate (1) 'ascertainable loss of money or property, real or personal,' (2) 'as a result of' the defendant's prohibited conduct under the statute." *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 180 (3d Cir. 2015) (quoting 73 P.S. § 201–9.2(a)). An ascertainable loss under the UTPCPL cannot be speculative, and "must be established from the factual circumstances surrounding each case." *Id.* (citation omitted). "The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages. Thus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount." *Id.* at 181 (internal alteration and ellipses omitted). In *Kaymark*, the Third Circuit assumed for purposes of its analysis that improperly inflated fees violated the UTPCPL, but nevertheless found that a plaintiff, who had not paid any portion of the improper fees, had not suffered an ascertainable loss. *Id.* at 180-81.

Here, Plaintiffs allege two types of losses. Ms. Bernstein alleges loss of specific real property caused by the installation of the concrete liner that is two inches shorter than was promised. And Ms. Schwartz alleges losses associated with reinterment of her son Marc, who initially was buried in the incorrect grave plot. With respect to Bernstein, I hold as a matter of law that any losses associated with the redistribution of space in the concrete liner are too miniscule to be actionable under the UTPCPL. Moreover, as discussed above, the concrete liner

installed by Defendants in the plot reserved for Bernstein contains *more* square footage than the space for which Bernstein bargained.  Stated differently, Bernstein cannot credibly claim ascertainable losses rooted in a diminution of real property where Defendants have actually provided her more real property than what they initially promised.

Like Bernstein, Ms. Schwartz has not suffered any ascertainable losses as defined by the UTPCPL.  Schwartz's argument is that she did not receive the benefits promised because one benefit for which she bargained was a single burial of her son.  Schwartz's theory is that the price she paid in 1975 for Marc's burial was artificially high because, had she known he would be disinterred and reinterred, she would have paid less.  Putting to one side the temporal remoteness of Schwartz's alleged loss—that she ostensibly paid an inflated price on a contract forty-five years ago—Schwartz's counterfactual theory of loss is too ephemeral to constitute an "actual loss."  Since the discovery that Marc was incorrectly buried in plot 4, Schwartz has not expended any money or disgorged any property to facilitate the disinterring and reinterring of her son.

**IV.    Conclusion**

For these reasons, I will grant Defendants' Motion for Summary Judgment.  An appropriate Order follows.

_____/s/ Gerald Austin McHugh_____
Gerald Austin McHugh
United States District Judge
